8.17.    **Regulation G, Etc.**

Neither the Borrower nor any of its Subsidiary is engaged principally, or as one of its important activities, in the business of, extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation G or U of the Board of Governors of the Federal Reserve System). Neither the Borrower nor any agent acting on its behalf has taken or will take any action which might cause this Agreement or the Note to violate Regulation G, T, U or X or any other regulation of the Board of Governors of the Federal Reserve System or to violate the Securities Exchange Act of 1934, in each case as in effect now or as the same may hereafter be in effect.

8.18.    **Governmental Consent.**

Neither the nature of the Borrower or of any of its Subsidiary, nor any of their respective businesses or properties nor any relationship between the Borrower or any Subsidiary and any other person, nor any circumstance in connection with the Advances or the issuance and delivery of the Note is such as to require any consent, approval or other action by or any notice to or filing with any court or administrative or governmental body (other than routine filings after the date of any closing with the Securities and Exchange Commission and/or State Blue Sky authorities) in connection with the execution and delivery of this Agreement, any Credit granted under this Agreement, or the issuance and delivery of the Note or fulfillment or compliance with the terms and provisions hereof or of the Note.

8.19.    **Holding Company Status.**

The Borrower is not a holding company, or a subsidiary or affiliate of a holding company, or a public utility, within the meaning of the Public Utility Holding Company Act of 1935, as amended, or a public utility within the meaning of the Federal Power Act, as amended.

8.20.    **Investment Company Status.**

The Borrower is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended or an "investment adviser" within the meaning of the Investment Advisers Act of 1940, as amended.

8.21.    **Encumbrances.**

Except for any prior Security Interest held by the Bank, none of the properties or assets of the Borrower is subject to any encumbrance and no obligations of the Borrower have any priority, or are subject to any preferential arrangement, whether or not constituting a security agreement, in favor of any creditor or class of creditors, the repayment of principal or interest, or the right to receive income or revenue.

27

## SECTION 9.  MISCELLANEOUS.

### 9.1.    Expenses.

The Borrower agrees, whether or not the transactions hereby contemplated shall be consummated, to pay, and keep the Bank harmless against liability for the payment of all out-of-pocket expenses arising in connection with this transaction, all taxes, together in each case with interest and penalties, if any, and any income tax payable by the Bank in respect of any reimbursement therefor, which may be payable in respect of the execution, delivery and performance of this Agreement or the execution, delivery, acquisition and performance of any Note (excepting only any tax on or measured by net income of the Bank determined substantially in the same manner, other than the rate of tax, as net income is presently determined under the Code), all printing costs and the reasonable fees and expenses of any special counsel to the Bank in connection with this Agreement and any subsequent modification thereof or consent thereunder and in connection with the enforcement of this Agreement.  The obligations of the Borrower under this Section shall survive payment of all amounts due under the Note.

### 9.2.    Consent to Amendments.

This Agreement may be amended, and the Borrower may take any action herein prohibited, or omit to perform any act herein required to be performed by it, if the Borrower shall obtain the Bank's prior written consent to such amendment, action or omission to act.  Each holder of the Note at the time or thereafter outstanding shall be bound by any consent authorized by this Section, whether or not such Note shall have been marked to indicate such consent, but any note or Borrowings under the Note issued thereafter may contain a reference, or bear a notation referring, to any such consent.  No course of dealing between the Borrower and the holder of the Note nor any delay in exercising any rights hereunder or under the Note shall operate as a waiver of any rights of any holder of such Note.  As used herein and in the Note, the term "this Agreement" and references thereto shall mean this Agreement as it may, from time to time, be amended or supplemented.

### 9.3.    Survival of Representations and Warranties.

All representations and warranties contained herein or made in writing by the Borrower in connection herewith shall survive the execution and delivery of this Agreement and of the Note and payment of the Note, regardless of any investigation made by the Bank or on its behalf.

### 9.4.    Successors and Assigns.

All covenants and agreements in this Agreement contained by or on behalf of either of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not.

9.5.    **Notices; E-Business Acknowledgment.**

Except as otherwise expressly provided in this Agreement, any notice required or desired to be served, given or delivered hereunder shall be in writing, and shall be deemed to have been validly served, given or delivered (a) upon receipt if deposited in the United States mails, first class mail, with proper postage prepaid, (b) upon receipt of confirmation or answerback if sent by telecopy, or other similar facsimile transmission, (c) one Business Day after deposit with a reputable overnight courier with all charges prepaid, or (d) when delivered, if hand-delivered by messenger, all of which shall be properly addressed to the party to be notified and sent to the address or number indicated as follows:

    to the Bank:

        Cathay Bank, Flushing Office            Cathay Bank, Corporate Office
        40-14/16 Main Street,                   777 North Broadway
        Flushing, New York 11354                Los Angeles, CA 90012
        Attention:  Pin Tai, General Manager    Attention: Anthony Tang, SEVP

    to the Borrower:

        United Aluminum Door Inc.
        267 Vandervoort Avenue
        Brooklyn, New York 11211
        Attention:   Wah Woon Tam, President

or to such other address or number as each party designates to the other in the manner prescribed herein.

Each party may electronically transmit to or receive from the other party certain documents ("E-Documents") via the Internet or electronic data interchange ("EDI"). Any transmission of data which is not an E-Document shall have no force or effect between the parties. EDI transmissions may be sent directly or through any third party service provider ("Provider") with which either party may contract. Each party shall be liable for the acts or omissions of its Provider while handling E-Documents for such party, provided, that if both parties use the same Provider, the originating party shall be liable for the acts or omissions of such Provider as to such E-Document. Some information to be made available to the Borrower will be specific to the Borrower and will require the Borrower's registration with the Bank before access is provided. After the Bank has approved the registration submitted by the Borrower, the Bank shall provide an ID and password(s) to an individual designated by the Borrower (the "Borrower Recipient"). The Borrower accepts responsibility for the designated individual's distribution of the ID and password(s) within its organization and the Borrower will take reasonable measures to ensure that passwords are not shared or disclosed to unauthorized individuals. The Borrower will conduct an annual review of all IDs and passwords to ensure they are accurate and properly authorized. **THE BANK MAY CHANGE OR DISCONTINUE USE OF AN ID OR PASSWORD AT ITS DISCRETION AT ANY TIME.** E-Documents shall not be deemed to have been properly received, and no E-

29

Document shall give rise to any obligation, until accessible to the receiving party at such party's receipt computer at the address specified herein. Upon proper receipt of an E-Document, the receiving party shall promptly transmit a functional acknowledgment in return. A functional acknowledgment shall constitute conclusive evidence that an E-Document has been properly received. If any transmitted E-Document is received in an unintelligible or garbled form, the receiving party shall promptly notify the originating party in a reasonable manner. In the absence of such a notice, the originating party's records of the contents of such E-Document shall control.

Each party shall use those security procedures which are reasonably sufficient to ensure that all transmissions of E-Documents are authorized and to protect its business records and data from improper access. Any E-Document received pursuant to this Section shall have the same effect as if the contents of the E-Document had been sent in paper rather than electronic form. The conduct of the parties pursuant to this Section shall, for all legal purposes, evidence a course of dealing and a course of performance accepted by the parties. The parties agree not to contest the validity or enforceability of E-documents under the provisions of any applicable law relating to whether certain agreements are to be in writing or signed by the party to be bound thereby. The parties agree, as to any E-Document accompanied by the Borrower's ID, that the Bank can reasonably rely on the fact that such E-Document is properly authorized by the Borrower. E-Documents, if introduced as evidence on paper in any judicial, arbitration, mediation or administrative proceedings, will be admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Neither party shall contest the admissibility of copies of E-documents under either the business records exception to the hearsay rule or the best evidence rule on the basis that the E-Documents were not originated or maintained in documentary form.

9.6.    **Descriptive Headings.**

The descriptive headings of the several Sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

9.7.    **Right of Set-off.**

Upon the occurrence and during the continuance of any Event of Default, the Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final), at any time held and other Indebtedness at any time owing by the Bank to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or the Note and although such obligations may be unmatured. The Bank agrees to promptly notify the Borrower after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Bank under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Bank may have.

9.8.    **Satisfaction Requirement.**

If any agreement, certificate or other writing, or any action taken or to be taken, is by the terms of this Agreement required to be satisfactory to the Bank, the determination of such satisfaction shall be made by the Bank in its sole and exclusive judgment exercised in good faith.

9.9.    **Third Party Claims.**

In case of the assertion in writing of any claim initiated or asserted by any person, firm, governmental authority or corporation other than the Bank (a "Third Party Claim") or the commencement of any litigation asserting a Third Party Claim which may give rise to any obligation of the Borrower to the Bank under the provisions of this Section, the Bank shall give notice thereof as provided hereunder as promptly as practicable after the Bank's receipt of such written assertion or the commencement of such litigation unless the failure to give such notice would not materially prejudice the Borrower (such notice to be given by the Bank not later than would materially prejudice the Borrower if it chose to defend such litigation as hereinafter provided). If the Borrower demonstrates to the Bank that the Borrower will be able to pay the full amount of potential liability in connection with any Third Party Claim, the Borrower may, at its sole cost and expense, upon written notice given to the Bank within thirty (30) days after its receipt of the Bank's notice under this Section, assume the defense, with counsel reasonably satisfactory to the Bank, of any such Third Party Claim or litigation, provided that the Borrower confirms in writing to the Bank the applicability of its indemnity to such Third Party Claim and the Borrower's sole liability (as between the Bank and the Borrower) with respect to all material elements of such Third Party Claim. If the Borrower assumes the defense of any such claim or litigation, the obligations of the Borrower hereunder as to such claim or litigation shall be limited to taking all steps necessary in the defense or settlement thereof and to holding the Bank harmless from and against any and all losses, liabilities, expenses and damages caused by or arising out of any settlement approved by the Borrower or any judgment in connection with such claim or litigation and the Bank shall make available to the Borrower such books and records in the Bank's possession as the Borrower may reasonably require in connection with such defense. Except with the express prior written consent of the Bank, the Borrower shall not consent to the settlement or entry of any judgment arising from any such claim or litigation which in each case does not include as an unconditional term thereof the giving by the claimant or plaintiff, as the case may be, to the Bank of any unconditional release from all liability in respect thereof unless the Borrower has actually paid the full amount of any such settlement or judgment. The Bank shall be entitled to be consulted about (but not control) the defense of, and receive copies of all pleadings and other material papers in connection with, any such claim or litigation. If the Borrower does not assume the defense of any such claim or litigation, the Bank may defend the same in such manner as it may deem appropriate, including but not limited to, settling such claim or litigation after giving reasonable notice of the same to the Borrower on such terms as the Bank may deem appropriate, and the Borrower will promptly reimburse the Bank in accordance with the provisions of this Section, provided that the Bank shall provide the Borrower with copies of all pleadings and other material documents in connection with any such claim or litigation and that the Borrower is consulted about (albeit not in control of) such litigation. Anything contained in this Section to the contrary notwithstanding, (a) the Borrower shall not be entitled to assume the defense of any such claim or litigation if the Third Party Claim seeks an order, injunction

31

or other equitable relief against the Bank; and (b) the Bank may defend any Third Party Claim to which the Bank may have a defense or counterclaim which the Borrower is not entitled to assert to the extent necessary to assert and maintain such defense or counterclaim, provided that, in either event, the Bank shall provide the Borrower with copies of all pleadings and other material documents in connection with any such claim or litigation and that the Borrower is consulted about (albeit not in control of) such litigation.

9.10.    **Jurisdiction and Consent to Service of Process**.

(i)    The Borrower hereby irrevocably and unconditionally submit, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may by enforced in order jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Bank may otherwise have to bring any action or proceeding relating to this Agreement or any other loan document against the Borrower or its properties in the courts of any jurisdiction.

(ii)    The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other loan document in any court referred to in Subsection (i) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(iii)   Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.5. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

9.11.    **Waiver of Jury Trial.**

THE BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IN WHICH THE BANK SHALL BE AN ADVERSE PARTY, AND THE BORROWER, IN ADDITION, WAIVES THE RIGHT TO INTERPOSE ANY DEFENSE BASED UPON ANY STATUTE OF LIMITATIONS OR ANY CLAIM OF LACHES AND ANY SET-OFF OR COUNTERCLAIM OF ANY NATURE OR DESCRIPTION IN ANY SUCH LITIGATION.

EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

9.12.    **Arbitration**.

The Borrower and the Guarantor agree that all disputes, claims and controversies between them, whether individual, joint, or class in nature, arising from this Agreement, the Note, the Guaranty, or any other loan document, including without limitation contract and tort disputes, may be arbitrated pursuant to the Rules of the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules and Supplemental Procedures for Financial Services Disputes, upon sole request of the Bank. No act to take or dispose of any collateral securing the Note or guaranty shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any collateral securing the Note or guaranty, including any claim to rescind, reform, or otherwise modify any agreement relating to the collateral securing the Note or Guaranty shall also be arbitrated, provided, however, that no arbitrator shall have the right or the power to enjoin or restrain any act of any party.

The arbitrators shall not have power to make an award of $1,000,000.00 or more against any party to an arbitration and the parties specifically reserve the right, upon a petition to vacate, to have any such award reviewed and vacated upon the same grounds as would result in reversal on appeal from a judgment after trial by court. Nothing in this Agreement, the Note or Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes.

The Bank, the Borrower and the Guarantor agree that in the event of an action for foreclosure of any collateral, whether or not real property or personal property, pursuant to the laws or in the jurisdiction where the collateral located, the commencement of such an action will not constitute a waiver of the right to arbitrate and the court shall refer to arbitration as much of such action, including counterclaims, as lawfully may be referred to arbitration. judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction.

33

To the extent not provided by this Agreement, including the Rules incorporated herein, arbitration hereunder shall be governed by New York arbitration law. Arbitration shall be conducted in the City of New York, New York, in English and, unless otherwise agreed to by the parties with respect to a particular dispute, shall be heard by a panel of three arbitrators. The arbitrators in any arbitration shall be experienced in the areas of law raised by the subject matter of the dispute. Lists of prospective arbitrators shall include retired judges. Notwithstanding the AAA rules, (a) any party may strike from a list of prospective arbitrators any individual who is regarded by that party as not appropriate for the dispute; and (b), if the arbitrator appointment cannot be made from the initial list of prospective arbitrators circulated by the AAA, a second and, if necessary, a third list shall be circulated and exhausted before the AAA is empowered to make the appointment.

The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

9.13.    **Delay**.

No delay or omission by the Bank in the exercise of any right or power or in the pursuance of any remedy accruing upon any Event of Default shall impair any such right, power or remedy or be construed to be a waiver of any such event of default or to be an acquiescence therein; nor shall the acceptance by the Bank of any security or of any payment of or on account of any installment of principal of or interest on the Note maturing after any Event of Default or of any payment on account of any past Event of Default be construed to be a waiver of any right to take advantage of any future Event of Default or of any past Event of Default not completely cured thereby. The Bank may waive any Event of Default by written notice to that effect to the Borrower, but no such waiver shall extend to or affect any subsequent or other Event of Default or impair any rights or remedies consequent thereon.

9.14.    **Table of Contents, Headings**.

Any table of contents and the headings and captions hereunder are for convenience only and shall not affect the interpretation or construction of this Agreement.

9.15.    **Severability**.

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or enforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

9.16.    **Offsets, Counterclaims and Defenses**.

The Borrower will not claim or demand or be entitled to any offsets, counterclaims or defenses of any nature whatsoever which the Borrower may have against the Bank and no such offsets, counterclaims or defenses shall be interposed or asserted by the

Borrower in any action or proceeding brought by the Bank and any such right to interpose or assert any such offsets, counterclaims or defenses in any such action or proceeding is hereby expressly waived by the Borrower.

9.17.  **Cross Default and Cross Collateralized**.

Either the Borrower or the Guarantor may from time to time have other loan obligations to the Bank.  All loans and/or credit facilities between the Borrower, or the Guarantor, and the Bank shall be cross-defaulted, and the collateral under the respective loan or credit facility shall be cross collateralized,  so that a default in any loan obligation to the Bank shall be a default in all loan obligations to the Bank.  In connection therewith, the Bank shall have the right, at its sole and absolute discretion, to collect against,  hold or withhold the Collateral or the Security Interest hereunder, until the full payment and satisfaction of all loans and/or credit facilities between the Borrower, or the Guarantor, and the Bank.

9.18.  **Further Assurances**.

The Borrower shall execute and deliver all such other documents and agreements and take all such other actions at its own cost and expense as the Bank or its counsel shall from time to time request in order to assure the Bank of the benefits of the rights granted to the Bank under this Agreement or any other agreements.

9.19  **Preparation of Agreement; Costs and Expenses.**

This Agreement was prepared by the Bank solely on behalf of the Borrower. The Borrower acknowledges that: (i) it had the advice of, or sufficient opportunity to obtain the advice of, legal counsel separate and independent of legal counsel for any other party hereto; (ii) the terms of the transactions contemplated by this Agreement are fair and reasonable to the Borrower; and (iii) the Borrower has voluntarily entered into the transactions contemplated by this Agreement without duress or coercion.  The Borrower further acknowledges that it was not represented by the legal counsel of the Bank or any other party hereto in connection with the transactions contemplated by this Agreement, nor was it under any belief or understanding that such legal counsel was representing its interests.  Except as expressly set forth in this Agreement, the Borrower shall pay all legal and other costs and expenses incurred or to be incurred by the Bank in negotiating and preparing this Agreement; in performing due diligence or retaining professional advisors; in performing any transactions contemplated by this Agreement; or in complying with the Borrower's covenants, agreements and conditions contained herein.  Each party agrees that no conflict, omission or ambiguity in this Agreement, or the interpretation thereof, shall be presumed, implied or otherwise construed against any other party to this Agreement on the basis that the Bank was responsible for drafting this Agreement.

9.20. **Counterparts.**

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

9.21. **Governing Law.**

This Agreement shall be construed in accordance with and governed for all purposes by the substantive law and public policy of the State of New York applicable to contracts made and to be wholly performed in that State.

9.22. **Entire Agreement.**

This Agreement and the documents referred to herein constitute the entire agreement of the parties hereto with respect to the subject matter hereof and shall supersede any prior expressions of intent or understandings with respect to this transaction.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the date and year first above written.

BANK:

CATHAY BANK, FLUSHING OFFICE

By: _____

PIN TAI, General Manager

(Corporate Seal)

BORROWER:

Attest:

UNITED ALUMINUM DOOR INC.

_____

SANDY LIANG, Secretary

By: _____

JEN-HAO MAO, Treasurer

36

## REVOLVING NOTE

**$1,500,000.00**                                       September 15, 2000
                                                        New York, New York

     **FOR VALUE RECEIVED, UNITED ALUMINUM DOOR INC.,** a New York corporation, having its principal place of business at 267 Vandervoort Avenue, Brooklyn, New York 11211 (the "Borrower") promises to pay to the order of **CATHAY BANK, FLUSHING OFFICE** (the "Bank") at the Bank's office, 40-14/16 Main Street, Flushing, New York 11354, the principal sum of **ONE MILLION FIVE HUNDRED THOUSAND and 00/100 ($1,500,000.00) DOLLARS,** or, so much thereof as shall have actually been advanced and/or readvanced by the Bank to or on behalf of the Borrower pursuant to the Credit Agreement, together with interest on the unpaid principal amount outstanding from time to time as hereinafter set forth and all other obligations of the Borrower to the Bank under the Credit Agreement, in lawful money of the United States of America, on or before **September          , 2001** (the "Expiration Date").

     The Borrower promises also to pay the Bank interest monthly on the Payment Date, computed on the basis of actual days outstanding during the month (plus, with respect to interest on payments of principal, the number of days after such month to but not including the payment day, a year of 360 days), as provided in the Credit Agreement, in like money, at such office: (i) from the date each Advance is made until such principal amount is paid in full on Expiration Date (whether by acceleration or otherwise) at the Interest Rate equal at all times to one (1%) percent above the Wall Street Journal Prime Rate, any change in the Interest Rate shall take effect simultaneously with the corresponding change in the Prime Rate; and (ii) from the maturity of each Advance until paid or after and during the continuance of an Event of Default (as defined in the Credit Agreement), at the Default Rate per annum which shall be five (5%) percent above the applicable Interest Rate.

     Notwithstanding anything to the contrary contained herein, in no event shall the total of all charges payable under this Note and the Credit Agreement which are or could be held to be in the nature of interest, exceed the maximum rate permitted to be charged by applicable law. Should the Bank receive any payment which is or would be in excess of that permitted to be charged under any such applicable law, such payment shall have been, and shall be deemed to have been, made in error and shall automatically be applied to reduce the principal balance outstanding on this Note.

     This Note has been delivered by the Borrower to the Bank and shall be deemed to be a contract made under the laws of the State of New York and for all purposes shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of laws.

     The Borrower and the Guarantor expressly waive any presentment, demand, protest or notice in connection with this Note, now or hereafter, required by applicable law. No failure to exercise, and no delay in exercising any rights hereunder on the part of the Bank shall operate as a waiver of such rights.

The Borrower and the Guarantor hereby expressly and unconditionally waive, in connection with any suit, action or proceeding brought by the Bank on this Note, any and every right it may have to (i) injunctive relief, (ii) a trial by jury, (iii) interpose any counterclaim therein and (iv) have the same consolidated with any other or separate suit, action or proceeding. Nothing herein contained shall prevent or prohibit the Borrower from instituting or maintaining a separate action against the Bank with respect to any asserted claim.

This Note is secured by any and all of the Guaranty, Security and Collateral at any time granted to the Bank pursuant to Sections 3.9 and 3.10 of the Credit Agreement to secure any Indebtedness of the Borrower.

This Note is the Note referred to in, and is entitled to the benefits of, the Credit Agreement, dated the even date hereof (as may be further amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and between the Borrower and the Bank, to which reference is made hereinabove. In case an Event of Default shall occur and be continuing, the unpaid sum of the principal of this Note, together with all accrued but unpaid interest thereon shall be declared to be due and payable immediately in the manner and with the effect provided in the Credit Agreement.

The Borrower hereby agrees to pay and keep the Bank harmless from any liability for the expenses arising in connection with the enforcement by the Bank of any of its rights under this Note or the Credit Agreement.

(Corporate Seal)

Attest:

BORROWER:

UNITED ALUMINUM DOOR INC.

_____        By: _____

SANDY LIANG, Secretary                  JEN-HAO MAO, Treasurer

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK       )

On the 15th day of September, in the year 2000 before me, the undersigned, personally appeared JEN-HAO MAO, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

2

## SCHEDULE I

## SCHEDULE OF ADVANCES/PAYMENTS

| Date | Advances | Payment | Unpaid Principal Balance | Name of Person Making Notation |
|------|----------|---------|--------------------------|-------------------------------|
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ | _____ |

# EXHIBIT B

## REVOLVING NOTE

**$1,500,000.00**

September 15, 2000
New York, New York

    **FOR VALUE RECEIVED,   UNITED ALUMINUM DOOR INC.,** a New York corporation, having its principal place of business at 267 Vandervoort Avenue, Brooklyn, New York 11211 (the "Borrower") promises to pay to the order of **CATHAY BANK, FLUSHING OFFICE** (the "Bank") at the Bank's office, 40-14/16 Main Street, Flushing, New York 11354, the principal sum of **ONE MILLION FIVE HUNDRED THOUSAND and 00/100 ($1,500,000.00) DOLLARS,** or, so much thereof as shall have actually been advanced and/or readvanced by the Bank to or on behalf of the Borrower pursuant to the Credit Agreement, together with interest on the unpaid principal amount outstanding from time to time as hereinafter set forth and all other obligations of the Borrower to the Bank under the Credit Agreement, in lawful money of the United States of America, on or before **September   15**   , 2001 (the "Expiration Date").

    The Borrower promises also to pay the Bank interest monthly on the Payment Date, computed on the basis of actual days outstanding during the month  (plus, with respect to interest on payments of principal, the number of days after such month to but not including the payment day, a year of 360 days), as provided in the Credit Agreement, in like money, at such office: (i) from the date each Advance is made until such principal amount is paid in full on Expiration Date (whether by acceleration or otherwise) at the Interest Rate equal at all times to one  (1%) percent above the Wall Street Journal Prime Rate, any change in the Interest Rate shall take effect simultaneously with the corresponding change in the Prime Rate; and (ii) from the maturity of each Advance until paid or after and during the continuance of an Event of Default (as defined  in the Credit Agreement), at the Default Rate per annum which shall be five (5%) percent above the applicable Interest Rate.

    Notwithstanding anything to the contrary contained herein, in no event shall the total of all charges payable under this Note and the Credit Agreement which are or could be held to be in the nature of interest, exceed the maximum rate permitted to be charged by applicable law.  Should the Bank receive any payment which is or would be in excess of that permitted to be charged under any such applicable law, such payment shall have been, and shall be deemed to have been, made in error and shall automatically be applied to reduce the principal balance outstanding on this Note.

    This Note has been delivered by the Borrower to the Bank and shall be deemed to be a contract made under the laws of the State of New York and for all purposes shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of laws.

    The Borrower and the Guarantor expressly waive any presentment, demand, protest or notice in connection with this Note, now or hereafter, required by applicable law. No failure to exercise, and no delay in exercising any rights hereunder on the part of the Bank shall operate as a waiver of such rights.

1

The Borrower and the Guarantor hereby expressly and unconditionally waive, in connection with any suit, action or proceeding brought by the Bank on this Note, any and every right it may have to (i) injunctive relief, (ii) a trial by jury, (iii) interpose any counterclaim therein and (iv) have the same consolidated with any other or separate suit, action or proceeding. Nothing herein contained shall prevent or prohibit the Borrower from instituting or maintaining a separate action against the Bank with respect to any asserted claim.

This Note is secured by any and all of the Guaranty, Security and Collateral at any time granted to the Bank pursuant to Sections 3.9 and 3.10 of the Credit Agreement to secure any Indebtedness of the Borrower.

This Note is the Note referred to in, and is entitled to the benefits of, the Credit Agreement, dated the even date hereof (as may be further amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and between the Borrower and the Bank, to which reference is made hereinabove. In case an Event of Default shall occur and be continuing, the unpaid sum of the principal of this Note, together with all accrued but unpaid interest thereon shall be declared to be due and payable immediately in the manner and with the effect provided in the Credit Agreement.

The Borrower hereby agrees to pay and keep the Bank harmless from any liability for the expenses arising in connection with the enforcement by the Bank of any of its rights under this Note or the Credit Agreement.

(Corporate Seal)

Attest:

_____    By: _____
SANDY LIANG, Secretary

BORROWER:

UNITED ALUMINUM DOOR INC.

JEN-HAO MAO, Treasurer

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

On the 15th day of September, in the year 2000 before me, the undersigned, personally appeared JEN-HAO MAO, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

2

KWAN YU TAM
Notary Public - State of New York
No. 01TA6043428
Qualified in Queens County
My Commission Expires June 19, 20__

## SCHEDULE  I

**SCHEDULE OF ADVANCES/PAYMENTS**

| Date | Advances | Payment | Unpaid Principal Balance | Name of Person Making Notation |
|------|----------|---------|--------------------------|--------------------------------|
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |
| ___ | _____ | _____ | _____ | _____ |

# EXHIBIT C

{00339189.DOC;1}

# FOURTH MODIFICATION OF CREDIT AGREEMENT

**THIS MODIFICATION,** dated this _2 nd_ day of May, 2005, between **UNITED ALUMINUM DOOR INC.,** a New York corporation, having its principal office at 267 Vandervoort Avenue, Brooklyn, New York 11211 (the "Borrower") and **CATHAY BANK, NEW YORK REGION,** having its principal office at 40-14 Main Street, Flushing, New York 11354 (the "Bank").

## WITNESSETH:

**WHEREAS,** the Bank has made available to the Borrower a revolving credit facility in the principal amount of $3,500,000.00 (the "Credit Facility") pursuant to the Credit Agreement, dated September 15, 2000, which was subsequently modified from time to time (the Credit Agreement and its subsequent modifications are collectively called the "Credit Agreement");

**WHEREAS,** the Credit Facility is evidenced by the Amended and Restated Revolving Note, dated May 1, 2003, made by the Borrower to the Bank in the said principal sum with interest thereon (the "Existing Note");

**WHEREAS,** the Credit Facility is secured by, among other things, the joint and several Guaranty of Payment dated November 12, 2002 (the "Guaranty") from Very-Tact International, Inc. (the "Existing Corporate Guarantor"), and Wah Woon Tam a/k/a Wayne Tam, Sandy Liang and Jen-Hao Mao (individually and collectively the "Existing Individual Guarantor") in the amount of $3,500,000.00;

**WHEREAS,** the Credit Facility will expire on April 30, 2005, the Borrower wishes to continuously borrow the Credit Facility, and has requested the Bank to extend the term thereof for a period of one year and reduce the amount of the Guaranty of the Existing Individual Guarantor;

**WHEREAS,** to induce the Bank to continue to extend the Credit Facility and reduce the amount guaranteed by the Existing Individual Guarantor, Bank has provided to the Bank two new guarantors, i.e., Archivisions, Inc. (the "New Corporate Guarantor") and Kuo Win Liu (the "New Individual Guarantor");

**WHEREAS,** the Bank is willing to accept the New Guarantors and grant such extension subject to the terms and conditions set forth below.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises set forth herein and for other good and valuable consideration, the parties hereto agree as follows:

1

1.  **Definitions.**

Except as otherwise defined  herein, all capitalized terms set forth in this Modification shall have the same meanings provided therefor in the Credit Agreement.

2.  **Credit Facility.**

The Bank and the Borrower hereby acknowledge and agree that, subject to the terms and conditions hereinafter set forth,  the aggregate principal amount of the Credit Facility be **THREE MILLION FIVE HUNDRED THOUSAND and 00/100 ($3,500,000.00) DOLLARS.**

Up to $3,500,000.00 is available to finance the Borrower's  Eligible Accounts Receivable based  upon a borrowing base formula of 80% of the Eligible Accounts Receivable (excluding all retainage receivable)  within 90 days from invoice date (excluding those Accounts outstanding for more than 90 days).

3.  **Expiration.**

The term of the Credit Facility shall be extended to May 31, 2005  (the "Expiration Date").

4.  **Interest Rate and Default Rate..**

The Interest Rate of the Credit Facility will maintain unchanged at a fluctuating rate per annum equal at all times to seven-eighths of one percent (0.875%)  above  the Wall Street Journal Prime Rate ("WSJP"). Any change in the Interest Rate will take effect simultaneously with the corresponding change in WSJP.  The interest will be calculated on the basis of a 360-day year and days actually elapsed.

After maturity,  whether by acceleration, notice of intention to prepay or otherwise, or during the continuance of an "Event of Default" as specified in Section 7.1 of the Credit Agreement, the rate of interest shall be five (5%) percent  per annum in excess of  the applicable Interest Rate (the "Default Rate"), but in no event to exceed the maximum rate allowed by applicable law.

5.  **Repayment.**

Interest shall accrue from and including the date of any payment or disbursement to, but not including,  the date of any repayment of principal.   Interest shall be due and payable monthly in arrears on the first day of each month (the "Payment Date") until the principal balance of each Advance has been fully repaid.  If any Payment Date is not a Business Day, the interest shall be due and payable on the next succeeding Business Day and the amount of interest due shall be computed accordingly.

2

Principal of the Credit Facility shall be due on the Expiration Date or on demand. **It is expressly agreed and understood by the Borrower that any and all account receivable proceeds collected will be automatically applied to the repayment of the Advances outstanding under the Credit Facility.**

6.    Note.

To evidence the obligations of the Borrower to repay the Credit Facility, the Borrower shall execute and deliver to the Bank the Amended and Restated Revolving Note (the "Amended Note") to replace and substitute the Existing Note. The Amended Note shall be entitled to the benefits of the Credit Agreement. However, the execution and delivery of the Amended Note shall not be deemed to automatically release any and all outstanding obligations owed by the Borrower to the Bank under the Existing Note.

7.    **Guaranty**.

Subject to Section 3.10 of the original Credit Agreement dated September 15, 2000:

(a)    the Existing Corporate Guarantor (Very-Tact International, Inc.("VTII")) and the New Corporate Guarantor (Archivisions, Inc., a New York corporation and the Affiliate of the Borrower ("AI")) shall submit to the Bank the joint and several unconditional continuing Guaranty of Payment in the amount of $3,500,000.00;

(b)    the Existing Individual Guarantor (Wah Woon Tam a/k/a Wayne Tam, Sandy Liang and Jen-Hao Mao) shall submit to the Bank the joint and several unconditional continuing Partial Guaranty of Payment in the amount of $3,150,000.00; and

(c)    the New Individual Guarantor (Kuo Win Liu) shall submit to the Bank the joint and several unconditional continuing Partial Guaranty of Payment in the amount of $350,000.00.

8.    **Collateral**.

The Borrower and the Guarantors (i.e., VTII, AI, Wah Woon Tam a/k/a Wayne Tam, Sandy Liang, Jen-Hao Mao and Kuo Win Liu), hereby reinstate, reaffirm, covenant and warrant that the Credit Facility be continuously secured by, among other things, the following Collateral as more specifically described in Section 3.11 of the original Credit Agreement:

(a)    the General Security Agreement dated September 15, 2000 duly executed by the Borrower and VTII together with the Financing Statement on Form UCC-1 and Form UCC-3 duly filed under the Uniform Commercial Code in the State of New York to perfect the first priority position Security Interest created by the General Security Agreement on the general assets of the Borrower and VTII;

(b)    the General Security Agreement dated May            , 2005 duly executed by

3

AI together with the Financing Statement on Form UCC-1 to be duly filed under the Uniform Commercial Code in the State of New York to perfect the first priority position Security Interest created by the General Security Agreement on the general assets of AI;

(c)    the Negative Pledge Agreement, dated September 15, 2000, by Wah Woon Tam a/k/a Wayne Tam, Jen-Hao Mao and Sandy Liang respectively, each of them undertakes, covenants and agrees to the Bank that they will not sell, dispose or creating any lien or additional financing and mortgage on their real properties as listed in the Schedule A of the Negative Pledge Agreement (except that Wayne Tam and Sandy Liang have refinanced their real property with the consent of the Bank as disclosed in their financial statements most currently submitted to the Bank); and

(c)    the Assignment Agreement, dated September 15, 2000, to assign to the Bank all the Borrower's right, title and interest of accounts receivable proceeds to the extent available in and to all monies now due or which may hereafter become due to the Borrower under the Eligible Accounts Receivable; all monies due under the Eligible Accounts Receivable shall be remitted and deposited to a lock box account with the Bank.

9.    **Representation and Covenants.**

To induce the Bank to extend the Credit Facility, the Borrower further represents and warrants that:

(a)    the Borrower is a corporation duly organized and existing in good standing under the laws of the State of New York and has the corporate power to own its assets and to transact the business in which it is engaged;

(b)    the Borrower has full legal right, requisite power and authority to borrow from the Bank under the Credit Agreement, and to execute, deliver and perform its obligations under the Credit Agreement, the Amended Note and all instruments, documents and agreements to which it is or will be a party and it has duly authorized by all requisite corporate action the execution, delivery and performance of the Credit Agreement, the Amended Note and all such instruments, documents and agreements to which it is a party;

(c)    the execution, delivery and performance by the Borrower of the Credit Agreement, and the Amended Note and the payment by the Borrower of principal, interest and any other sums that may become due and owing under the Credit Agreement and the Amended Note do not: (i) conflict with the Certificate of Incorporation or by-laws of the Borrower; (ii) violate any provision of law, regulation, judgment, award, decree, order, writ, injunction or permit applicable to the Borrower; (iii) conflict with or result in default of the performance, observance or fulfillment of the material obligations, covenants, or agreements contained in any agreement or instrument to which the Borrower is a party or by which it or any of its properties or assets are bound; or (iv) constitute a breach of any restriction which will materially adversely affect its business, operation, creation or imposition of any lien, security interest, charge or encumbrance upon any property or assets of the Borrower;

4

(d)    there are no actions, suits or proceedings before any court, arbitral tribunal, governmental agency or administrative body pending or, to the best of the Borrower's knowledge, threatened against or affecting it, which if adversely determined would materially adversely affect the financial condition of the Borrower or its operations or would materially impact any of its rights or abilities to perform its business as now conducted or as contemplated to be conducted or the financial ability of the Borrower to pay, when due, the principal of and interest on the Credit Facility and any other sums that may become due and owing under the Credit Agreement, the Amended Note or any other document or instrument to which it is a party; and

(e)    the Borrower is conducting its business and operations in compliance with all applicable laws, all directives of governmental agencies and authorities having effect on the operations, business, property, assets or condition (financial or otherwise) of the Borrower.

10.    **Financial Statements**.

The Borrower shall submit to the Bank for review the following financial statements:

(a)    as soon as practicable, but in any event within **120 days** after the end of the fiscal year, a complete copy of the **CPA reviewed** consolidated annual financial statements of the Borrower, including the related reviewed statement of income, profit and loss statement, reconciliation of surplus statement, source and application of funds statement and shareholders equity for such year, and a balance sheet as of the end of such year, setting forth in each case in comparative form the corresponding figures for the previous fiscal year end, which shall be prepared in accordance with GAAP, applied on a consistent basis, and which shall be accompanied by a report of an independent certified public accountant, however, the Bank may, at its sole discretion, require such final statements to be certified by a certified public accountant approved by the Bank;

(b)    as soon as practicable, but in any event within **15 days** after filing of each year, a complete copy of the business income tax return of the Borrower, VTII and AI prepared by an independent certified public accountant;

(c)    as soon as practicable, but in any event within **30 days** prior to the Expiration Date of the Credit Facility, the updated and signed copy of the personal financial statement and within **15 days** after filing of each year, the signed copy of the most currently filed personal income tax return of each Individual Guarantor;

(d)    as soon as practicable, but in any event within **30 days** after the end of each month in each fiscal year:

      (i)    the monthly financial statements prepared by an authorized officer of the Borrower;

      (ii)    the monthly account receivable aging and account payable aging reports, in form and substance satisfactory to the Bank,

accompanied by a certificate to that effect executed by an authorized officer of the Borrower stating that the related receivable and payable are within the discretionary limit under the Collateral of the borrowing base formula as specified in Section 2.1 in the Credit Agreement;

  (iii) the monthly job status report and cash receipts journal,

  (iv) the monthly reconciliation statement of accounts receivable and accounts payable between the aging report and the general ledger; and

  (v) other related statements of the Borrower as may be reasonably required by the Bank.

  (e) as soon as practicable, but in any event within **15 days** after the end of each month the monthly Borrowing Base Certificate.

## 10. **Financial Covenants.**

The Borrower shall, at all times during the term of the Credit Facility, maintain the following financial covenants:

  (a) the minimum adjusted Tangible Net Worth of not less than $4,000,000.00 (including the Subordinated Debt);

  (b) the Debt to adjusted Net Worth Ratio not higher than 2.5 : 1.00 (including the Subordinated Debt); definition of the "Debt" shall exclude the deferred income tax liability of the Borrower;

  (c) the Current Ratio not less than 1.2 : 1;

  (d) each of the Existing Individual Guarantor undertakes that he/she will not sell or create additional mortgage and financing on his/her real property listed in the financial statements dated November 30, 2004 of Wah Woon Tam a/k/a Wayne Tam, the financial statements dated November 30, 2004 of Sandy Liang and the financial statements dated September 30, 2004 of Jen-Hao Mao, without the Bank's prior written consent.

  (e) the Borrower will not bid on any project or contract below its costs; and

  (f) any and all indebtedness and obligations of the Borrower to Summit Engineering Ltd., whether now existing or hereafter from time to time incurred, shall be subject and subordinated to any and all indebtedness and liabilities of the Borrower to the Bank according to the Subordination Agreement dated March 28, 2002.

11.    **Loan Restrictions.**

Without the bank's prior written consent, the Borrower shall not borrow, create or incur any additional loan, credit facility, or financial liability with other Person, factor, or lender except the normal trade credits in the Borrower's ordinary course of business.

12.    **Maintenance of Bank Accounts.**

The Borrower shall, at all times during the term of the Credit Facility, maintain with the Bank all its transactional and operating account for deposits, transfer of proceeds and collection of accounts receivable.

13.    **Books and Records; Field Audit.**

The Borrower shall permit any person or auditor designated by the Bank in writing, at the Borrower's sole cost and expense, at least once a year, during business hours upon reasonably advanced notice, to visit and inspect the operation and any of the properties of the Borrower, including, but not limited to, the examination of the corporate books, inventory, accounts receivable, and accounting and financial records of the Borrower and its Subsidiaries and make copies thereof or extracts therefrom and to discuss the affairs, finances and accounts of any of such corporations with their respective executive officers or with their respective independent accountants.

14.    **Right to Terminate.**

The Bank reserves the right to reduce the amount and utilization of the Credit Facility or suspend the availability of the Credit Facility, if, at the Bank's sole and absolute discretion, the terms and conditions of the Credit Agreement are not strictly complied with, or if the business of the Borrower has deteriorated materially since the date of the Credit Agreement or if there has been a material adverse change in the financial condition of the Borrower or the Guarantor since the date of the most recent financial statements submitted to the Bank.

15.    **Maintenance of Insurance.**

The Borrower shall maintain, at all times during the term of the Credit Facility, the following insurances:

(a)    the property insurance with "All-Risk" coverage be maintained on the Borrower's furniture, fixtures, equipment, cargo and inventory located at its principal place of business and its warehouse(s) as reasonably approved by the Bank for the full replacement cost, and/or such other insurance as is customary with companies in the same or similar businesses, in an amount as the Bank may reasonably require or deem appropriate, naming the Bank as additional insured and loss payee, and a marine insurance policy required for letter of credit issued on FOB, C&F and FAS basis;

7

(b) public liability insurance, which shall include product liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death or properties owned, occupied or controlled by it; and

(c) such other insurance as may be required by law or as may be reasonably required in writing by the Bank.

The Borrower shall provide to the Bank promptly upon receipt of written request thereof, evidence of the annual renewal of each such policy.

16.    **Fees and Expenses**.

The Borrower shall pay to the Bank a facility fee in an amount equal to one-fifth (0.2%) percent of the Credit Facility, or $7,000.00. Such fee shall be paid on or before the execution of this Modification. The Borrower shall also pay to the Bank any fees as computed at the Bank's standard rate at the time of such drawing, as the Bank's administrative charge. The Bank reserves the right, at its sole and absolute discretion, to change such fees, commissions and expenses from time to time without any prior notice. The Borrower shall also pay to the Bank the fees and expenses, including without limitation, recording fees, taxes, credit and lien searches and legal fees incurred by the Bank under the Credit Facility.

17.    **Right of Set-off**.

The Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final), at any time held and other Indebtedness at any time owing by the Bank to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or the Note and although such obligations may be unmatured. The Bank agrees to promptly notify the Borrower after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application. The right of the Bank under this paragraph is in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Bank may have.

18.    **Modification**.

Except as modified and amended by this Modification, the terms of the Credit Agreement are hereby ratified and confirmed in all respects and remain unchanged by reference as if fully set forth herein, and the parties hereto assume and agree to be bound by the provisions thereof with the same force and effect as if the Credit Agreement is herein set forth at length.

19.    **Conflict**.

In the event of any conflict, ambiguity or inconsistency between the provisions of the Credit Agreement and the provisions of this Modification, then the terms, covenants and conditions

of this Modification shall control.

    20.    **Successors**.

        This Modification shall bind and inure to the benefit of each of the parties hereto and their respective successors and assigns and may not be changed or terminated orally.

        **IN WITNESS WHEREOF**, this Modification has been duly executed by the parties hereto as of the day and year first above written.

BANK:

CATHAY BANK, NEW YORK REGION

By: _____
PEGGY CHAN,
First Vice President & Manager

By: _____
PIN TAI,
Senior Vice President & Division Manager

BORROWER:

UNITED ALUMINUM DOOR INC.

By: _____
WAYNE TAM, President

(Corporate Seal)

Attest:

_____
SANDY LIANG, Secretary

9