# EXHIBIT A

## CREDIT AGREEMENT

**CREDIT AGREEMENT** dated as of the 15th    day of September    , 2000 between **UNITED ALUMINUM DOOR INC.**, a New York corporation, having its principal place of business at 267 Vandervoort Avenue, Brooklyn, New York 11211 (the "Borrower") and **CATHAY BANK, FLUSHING OFFICE**, having its principal place of business at 40-14/16 Main Street, Flushing, New York 11354 (the "Bank");

## W I T N E S S E T H :

**WHEREAS**, the Borrower desires that the Bank extend a revolving credit facility as provided herein; and

**WHEREAS**, subject to and upon the terms and conditions herein set forth, the Bank is willing to make available to the Borrower such revolving credit facility which shall not exceed in the aggregate principal amount at any one time outstanding $1,500,000.00.

**NOW, THEREFORE**, it is agreed:

**SECTION 1. DEFINITIONS; ACCOUNTING TERMS.**

1.1.    **Definitions**.

As used in this Agreement the following terms shall have the meanings herein specified and shall include in the singular number the plural and the plural number the singular:

"**Advance**" means the disbursement by the Bank of a sum or sums loaned to the Borrower pursuant to this Agreement.

"**Affiliate**" of any person means any other person directly or indirectly controlling, controlled by, or under common control with, such person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Credit Agreement, dated as of the Closing Date, as it  may hereafter be amended, restated, supplemented or otherwise modified from time to time.

"**Borrowing Base Certificate**" means a certificate signed by the President or an authorized officer in the form of Exhibit B annexed hereto with such changes as the Bank may require from time to time.

"**Business Day**" means every day except Saturday, Sunday or any other day which in New York, New York shall be a legal holiday, and any day on which banking institutions in New York City are authorized by law to close.

1

"**Capital Lease**" means any lease which has been capitalized on the balance sheet of the lessee in accordance with GAAP.

"**Closing Date**" means the date this Agreement has been executed by the Borrower and the Bank.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means all personal property and fixtures of the Borrower, whether now or hereafter existing or now owned or hereafter acquired and wherever located, of every kind and description, tangible or intangible, including, but not limited to, all goods, documents, instruments, chattel paper, accounts, contract rights and general intangibles and including the products and proceeds thereof and accessions thereto, constituting security for obligations of the Borrower hereunder, direct or contingent, including, without limitation, the assets, property and interests in property described in the General Security Agreement.

"**Commitment**" means the Bank's agreement to extend credit to the Borrower hereunder and subject to the terms hereof in the aggregate principal amount of up to $1,500,000.00, as such amount may be reduced or otherwise modified, from time to time, in accordance with the provisions of this Agreement.

"**Commitment Period**" means the period beginning on the Closing Date and ending on the earlier of (i) the Expiration Date as defined below, or (ii) the date on which the Bank terminates its Commitment after the occurrence of an Event of Default.

"**Credit Facility**" means any Advance  made by the Bank to the Borrower pursuant to Section 2.1 hereof.

"**Credit Instruments**" shall have the meaning specified in Section 2.3.

"**Current Assets**" means, at a particular date, all amounts which would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a balance sheet of the Borrower at such date; provided, however, such amount shall in any event include all publicly quoted and readily marketable securities owned by the Borrower, valued at the lower of cost or market value. Current Assets shall exclude all intangible assets, including without limitation, organizational expenses, intellectual property, good will, loans or mortgages due from shareholders and/or employees, treasury stock, security deposits and deferred charges.

"**Current Liability**" means, at a particular date, all amounts which would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a balance sheet of the Borrower at such date, and shall include, without limitation, all obligations payable on demand or within one year after the date on which the determination is made and all obligations of the Borrower under this Agreement.

"**Current Ratio**" means the ratio of (i) the Current Assets of the Borrower, to (ii) the Current Liability of the Borrower.

"**Default**" means any event which with the giving of notice or lapse of time, or both, would become an Event of Default.

"**Default Rate**" means, with respect to the principal of any Advance and, to the extent permitted by law, any other amount payable by the Borrower under this Agreement or the Note, a rate per annum equal to five (5%) percent above the Interest Rate otherwise applicable to such Advance.

"**Dollars**" and the sign "$" mean lawful money of the United States of America.

"**Eligible Accounts Receivable**" or "**Accounts Receivable**" means an Account which has been identified and described to the Bank's satisfaction, is represented by the Borrower (by its acceptance of the Commitment) as meeting all of the following criteria on its origination date and thereafter until collected, and is in all other respects acceptable to the Bank, in its sole and absolute discretion: (i) the Borrower is the sole owner of the Account and has not sold, assigned or otherwise transferred it, and the Account is not subject to any claim, lien or security interest; (ii) the Account is a bona fide and legally enforceable and owing to the Borrower for the sale of goods and performance of services in the United States, its territories and possessions, and in the ordinary course of business and the Account does not require any further act on the part of the Borrower to make it owing by the Account debtor, and the Borrower has delivered to the Bank (or, at the time of origination of the Account, if required by the Bank, will deliver to the Bank) invoices, billings, shipping documents and other documents evidencing the obligation to pay the Account; (iii) the Account does not represent a conditional sale, consignment or other sale on a basis other than that of absolute sale, is not evidenced by any note, instrument, chattel paper or like document; (iv) the Account is invoiced for payment of service inventory or other goods represented thereby are shipped or performed to the Account debtor, and said billing statement has not been outstanding for more than 90 days; (v) the amount of the Account included in calculating the advance limit as provided in Section 2.1 does not exceed eighty (80%) percent of the Borrower's aggregate total Eligible Accounts Receivable at the time outstanding; (vi) the Account is not subject to any defense, offset, counterclaim, credit, allowance or adjustment except usual and customary prompt payment discounts, nor has the Account debtor returned the goods or indicated any dispute or complaint concerning them; (vii) no other Account of the Account debtor is overdue in payment, and the Borrower has not received any notice, nor has any knowledge, of any facts which adversely affect the credit of any Account debtor; (viii) the Account debtor is not an Affiliate or Subsidiary of the Borrower nor a director or officer of the Borrower or an Affiliate of any director or officer; (ix) the Account does not represent a contra account; and (x) an Account which otherwise satisfies the requirements of the Bank at its sole discretion.

"**Environmental Laws**" means any federal, state or local laws, ordinances, permits or regulations, or any common law, regarding health, safety, radioactive materials, or the environment, including, but not limited to, the following federal statutes: Clean Air Act (42 U.S.C. §7401 et seq.) ("CAA"), Clean Water Act (33 U.S.C. §1251 et seq.) ("CWA"), Resource Conservation and

Recovery Act (42 U.S.C. §6901 et seq.) ("RCRA"), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §9601 et seq.) ("CERCLA"), Emergency Planning and Community Right-to-Know Act (42 U.S.C. §11001 et seq.) ("EPCRA"), Safe Drinking Water Act (42 U.S.C. §300f et seq.) ("SDWA"), Toxic Substances Control Act (15 U.S.C. §2601 et seq.) ("TSCA"), Endangered Species Act of 1973 (16 U.S.C. §1531 et seq.) ("ESA"), Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §136 et seq.) ("FIFRA"), and the Occupational Safety and Health Act (29 U.S.C. §651 et seq.) ("OSHA"), each as amended, and any regulations promulgated thereunder, guidances and directives issued with respect thereto, or policies adopted by authority thereunder.

"**Event of Default**" shall have the meaning given such term in Section 7.1.

"**Expiration Date**" means the earlier of (i) the date on which all Advances are paid in full and the Commitment shall terminate hereunder and the obligations of the Borrower in connection therewith have been satisfied, or (ii) September __15__, 2001.

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time, applied on a consistent basis.

"**Guarantor**" means Very-Tact International, Inc., a New York corporation ("VTII"), Wah Woon Tam a/k/a Wayne Tam, Sandy Liang and Jen-Hao Mao and each of them, from time to time, is required to execute a Guaranty of Payment.

"**Hazardous Substance**" means any material, whether animate or inanimate, raw, processed or waste by-product, which in itself or as found or used, is potentially toxic, noxious or harmful to the health or safety of human or animal life or vegetation, regardless of whether such material be found on or below the surface of the ground, in any surface or underground water, or airborne in ambient air or in the air inside of any structure built or located upon or below the surface of the ground, or in any machinery, equipment or inventory located or used in any such structure, including, but in no event limited to all hazardous materials, hazardous wastes, toxic substances, infectious wastes, pollutants and contaminants from time to time defined or classified as such under any Environmental Law regardless of the quantity found, used, manufactured or removed from a given location.

"**Indebtedness**" means with respect to any Person: (i) indebtedness of such Person for borrowed money, (ii) indebtedness of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) obligations to pay the deferred purchase price of property or services, (iv) obligations of such Person as lessee under leases which shall have been or should be, in accordance with GAAP, consistently applied, recorded as Capital Lease, (v) the face amount of any outstanding letters of credit issued for the account of such Person; (vi) obligations arising under acceptance facilities; (vii) obligations secured by any Lien on property of such Person; (viii) deferred taxes; and (ix) obligations of such Person under direct or indirect guarantees in respect of, and obligations of such Person (contingent or otherwise) to purchase, to provide funds for payment, to supply funds to invest in any persons, or otherwise to acquire, or to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above.

"**Lien**" means any lien (statutory or otherwise), security interest, mortgage, deed of trust, priority, pledge, charge, conditional sale, title retention agreement, or other encumbrance or similar right of others, or any agreement to give any of the foregoing.

"**Note**" means the revolving note of the Borrower evidencing the Advances made by the Bank hereunder.

"**Negative Pledge**" means Wah Woon Tam a/k/a Wayne Tam, Jen-Hao Mao and Sandy Liang undertake, covenant and agree that they will not dispose, sell or create any lien on their real properties listed in the Schedule A of the Negative Pledge Agreement duly executed by them respectively.

"**Permitted Liens**" means those certain Liens defined in Section 6.1 hereof.

"**Person**" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Security Interest**" means both the "Specific Security Interest" and "General Security Interest". "**Specific Security Interest**" means any and all equipment, machinery and factory fixtures, as more specifically described in the General Security Agreement, the first preferred and enforceable security interest covering such equipment, machinery and factory fixtures in favor of the Bank duly filed as required by the laws of the State where the principal office of business of the Borrower is located and any other jurisdiction that the Bank deems appropriate. "**General Security Interest**" means any perfected and enforceable security interest of the Bank in Collateral, however arising, other than a Specific Security Interest.

"**Subsidiary**" means, with respect to any Person, any corporation, association or other business entity more than 50% of the outstanding shares of stock of each class having ordinary voting power (other than stock having such power only by reason of the happening of a contingency) is at the time owned by the Borrower or by one or more Subsidiaries of the Borrower or by the Borrower and one or more Subsidiaries of the Borrower.

"**Tangible Net Worth**" means (a) total assets of the Borrower determined in accordance with GAAP, applied on a consistent basis, except that there shall be excluded therefrom all obligations due to the Borrower from an Affiliate and all intangible assets, including, without limitation, organizational expenses, patents, trademarks, copyrights, goodwill, covenants not to compete, research and development costs, training costs, and all unamortized debt discount, and deferred charges, less (b) the total liabilities of the Borrower determined in accordance with GAAP, applied on a consistent basis.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in New York.

"**Uniform Customs**" means the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500, as the same may be amended from time to time.

"**Wall Street Prime Rate**" means the rate of interest as published by The Wall Street Journal in its Money Rate Section from time to time as the commercial lending rate of interest, which is the base rate for calculating interest on certain loans. In the event that The Wall Street Journal should cease or temporarily interrupt publication or if the Prime Rate is no longer otherwise available or is limited, regulated or administered by a governmental or quasi-governmental body, then the Bank shall select a comparable interest rate which is readily available and verifiable by the Bank at its sole and absolute discretion. The Bank will give the Borrower notice of its choice of substitute Prime Rate and when the change became effective. It is expressly understood that the Prime Rate need not be the lowest rate charged by the Bank to any customer. Any change in the Interest Rate will take effect simultaneously with the corresponding announced change in the Prime Rate. If more than one Prime Rate is published in The Wall Street Journal for a day, the highest of the Prime Rates shall be used.

1.2.    **Accounting Terms.**

All accounting terms not specifically defined herein shall be construed in accordance with GAAP, and all financial data required to be delivered hereunder shall be prepared in accordance with GAAP.

**SECTION 2.  AMOUNT AND TERMS OF CREDIT FACILITY.**

2.1.    **Credit Facility.**

(i)    Subject to the terms and conditions set forth herein and to the Bank's review and customary overriding right of repayment on demand, the Bank agrees, at its sole and absolute discretion, to make credits and loans in Dollars to the Borrower, on a revolving basis, at any time and from time to time on any Business Day from and including the date hereof to but excluding the Expiration Date up to but not exceeding at any one time outstanding, the amount of its Commitment (each an "Advance" and collectively the "Advances") to be drawn by the Borrower on its account with the Bank. At no time shall the aggregate amount of the Advances exceed the sum or value of $1,500,000.00 (the "Credit Facility"). The Advances which are used to finance the Borrower's Eligible Accounts Receivable only will be based on a borrowing base formula of 80% of the Eligible Accounts Receivable (excluding those Accounts outstanding for more than 90 days from invoice date)

Subject to the foregoing limits, the Borrower may borrow, repay and reborrow, on or after the date hereof and prior to the Expiration Date, all or portion of the Credit Facility hereunder.

2.2.    **Purpose of Credit Facility.**

(i)    The purpose of the Credit Facility is to finance the Borrower's Eligible Accounts Receivable only. The Borrower shall use the proceeds of the Advances for specific purposes permitted hereunder and cannot use for any other purpose, including, but not limited to, financing the trade needs of any of the Borrower's Affiliates or Subsidiaries or any other Person. No part of the proceeds of any of the Advance will be used for any purpose which violates the

provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System as in effect on the date of making such Advance.

(ii)    The Bank reserves the right to reduce the amount and/or utilization of the Credit Facility or suspend the availability of the Credit Facility, if, at the Bank's sole and absolute discretion, the terms and conditions of this Agreement are not strictly complied with, or if the business of the Borrower has deteriorated materially or if there has been a material adverse change in the financial condition of the Borrower or the Guarantor.

2.3.    **Revolving Note.**

The Credit Facility made by the Bank shall be evidenced by a promissory note in favor of the Bank with appropriate insertions, duly executed and completed by the Borrower. At the time of the making of each advance and at the time of making of each payment of principal thereof, the Bank shall either keep a computer record or make a notation on Schedule I annexed to and constituting a part of the Note, specifying the date and amount of the related Advance, the date and amount of each payment of principal thereof, and the principal amount subject thereto, and, absent manifest error, any such recordation shall constitute conclusive evidence of the information so recorded; provided that the failure to make any such recordation shall not in any way affect the Borrower's obligation to repay the Advance.

If it is necessary to evidence an extension of the Expiration Date or any other change in the provisions of this Agreement relating to the Note and agreed to in writing by the Bank and the Borrower, the Borrower shall furnish a new Note to the Bank in substitution for but not in discharge of the liability represented by the prior Note. The first notation made by the Bank on Schedule I of the replacement Note or a computer print out from the Bank relating to such amount shall be the last outstanding principal balance evidenced by the replaced Note. Such Note may be payable on demand or on a term basis or on a combination thereof, and may evidence single, multiple or revolving advances of the Credit Facility. All instruments, documents and agreements now or hereafter executed evidencing or creating any obligation of the Borrower to the Bank or in respect of any notes, acceptances, letters of credit, drafts or bills of exchange drawn, or to be drawn, upon the Bank for the account of, or to be charged to, the Borrower pursuant to this Agreement, including, but not limited to, any applications for acceptances of letters of credit, any note evidencing an Advance or other extension of a credit or loan under the Credit Facility are referred to hereunder as the "Credit Instruments".

2.4.    **Interest Rate, Late Payment Penalty and Default Rate.**

(i)    The unpaid principal amount of the outstanding Advances evidenced by the Note shall bear interest, from time to time at a rate per annum equal at all times to one (1%) percent above the Wall Street Prime Rate (the "Interest Rate"), the Interest Rate will change as and when the Wall Street Prime Rate shall change.

(ii)    Interest shall be computed on the basis of actual number of days elapsed on the basis of a year of 360 days. Interest shall accrue from and including the date of any payment or

disbursement to, but not including the date of any repayment of principal. Interest shall be due and payable monthly in arrears on the first day of each month (the "Payment Date") until the principal balance of each Advance has been fully repaid. If any Payment Date is not a Business Day, the interest shall be due and payable on the next succeeding Business Day and the amount of interest due shall be computed accordingly.

       (iii)    After maturity of the Note, whether by acceleration, notice of intention to prepay or otherwise, or during the continuance of an "Event of Default" as specified in Section 7.1 of this Agreement, the rate of interest hereunder shall be the Default Rate at five (5%) percent per annum in excess of the applicable Interest Rate, but in no event to exceed the maximum rate allowed by applicable law.

    2.5.    **Manner of Borrowing.**

       If an Advance is required, the Borrower shall give the Bank at or before 2:00 p.m. a written notice (a "Notice of Borrowing") specifying the aggregate amount of such borrowing. Each Notice of Borrowing shall be irrevocable and binding on the Borrower and the Borrower shall indemnify the Bank against any cost, loss or expense incurred by the Bank as a result of any failure to fulfill, on or before the date specified for a borrowing, the conditions to such borrowing set forth herein, including without limitation, any cost, loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by the Bank to fund the Advance to be made by the Bank as part of such borrowing. Upon receipt of the Note and such other documentation, in form and substance satisfactory to the Bank, the Bank shall make the proceeds of such Advance available to the Borrower by crediting the account of the Borrower.

    2.6.    **Pricing for the Credit Facility.**

       The Borrower shall pay to the Bank a facility fee in an amount of $3,750.00. Such fee shall be paid on or before the Closing Date. ~~The Borrower shall also pay to the Bank such fees~~ as computed at the Bank's then prevailing rate at the ~~time of each drawing~~, as the Bank's administrative charge. The ~~Bank reserves the right~~, at its sole and absolute discretion, to change ~~such fees, commissions and expenses from time to time without any prior notice.~~

    2.7.    **Payments & Lock Box Account.**

       Repayment of principal shall be made on demand or at maturity. All payments of principal, interest and any other fees charges and expenses under this Agreement or the Note, shall be made by the Borrower in Dollars in immediately available funds, not later than 2:00 p.m. New York City time on the relevant dates as specified (each such payment made after such time on such due date to be deemed to have been made on the next succeeding Business Day) at the offices of

the Bank, or at such other offices as may be designated in writing to the Borrower by the Bank, or any successor thereto. **It is expressly agreed and understood by the Borrower that it shall notify, in writing, all debtors of its accounts receivable with respect to the Bank being the assignee of said accounts and provide such Bank's information for remittance purposes and any and all account receivable proceeds collected from the Eligible Accounts Receivable will be deposited with the Bank in a lock box account automatically applied to the repayment of the advances under the Credit Facility.**

The Bank may (but shall not be obligated to) debit the amount of any payment which is not made by such time to any deposit or account of the Borrower with the Bank. The Bank may apply any such payment as it may elect in its sole discretion against the payments of any principal or other amount payable by the Borrower. If the due date of any payment under this Agreement or the Note would otherwise fall on a day which is not a Business Day, such date shall be extended to the next succeeding Business Day and interest shall be payable for any principal so extended for the period of such extension.

2.8.    **Increased Costs.**

If at any time the introduction of or any change in applicable law, rule or regulation or in the interpretation or administration thereof by any governmental authority, central bank or other comparable authority charged with the interpretation or administration thereof, or compliance by the Borrower with any request or directive by any such authority (whether or not having the force of law) shall either (i) impose, modify or make applicable any reserve, deposit or similar requirement against the Credit Facility granted by the Bank under this Agreement or (ii) shall impose on the Bank any other conditions affecting this Agreement; and the result of any of the foregoing is to increase the costs to the Bank of making or maintaining the Credit Facility, or reduce the amount of any sum received or receivable by the Bank hereunder, then, upon demand to the Borrower by the Bank, the Borrower shall pay to the Bank such additional amount or amounts as will compensate the Bank for such increased cost or reduction. A certificate submitted to the Borrower by the Bank, setting forth the basis for the determination of such additional amount or amounts necessary to compensate the Bank as aforesaid, shall be conclusive and binding on the Borrower absent manifest error.

2.9.    **Taxes, Other Costs.**

(i)    The Borrower will make all repayments of the Advances free and clear of and without deduction for or on account of any and all present and future taxes, imposts, deductions, charges and withholdings of any nature whatsoever (excluding taxation on or measured by the overall net income of the Bank or any branch, subsidiary or affiliate of the Bank including a franchise tax based upon overall net income) herein called collectively "Taxes". If any Taxes are levied or imposed, the Borrower shall pay all of them directly to the appropriate taxing authority and shall forward to the Bank official receipts or other evidence of payment acceptable to the Bank. If any Taxes are paid by the Bank, the Borrower will indemnify the Bank for such payments, together with any interest, penalties and expenses in connection therewith, plus interest thereon at the rate specified herein, except to the extent that any such interest, penalties or expenses are caused by the

9

negligence or willful misconduct of the Bank. The Bank shall forward to the Borrower official receipts or other evidence of payment of any Taxes.

      (ii)    If at any time any new law, regulation or directive or any change in existing law, regulation or directive or any interpretation thereof shall (a) subject the Bank to any tax (including without limitation any United States interest equalization or similar tax, however named), duty, charge, fee, deduction or withholding on or from payments due from the Borrower hereunder in connection with the Credit Facility or (b) change the basis of taxation of payments due from the Borrower hereunder in connection with the Credit Facility (otherwise than by a change in taxation on or measured by the overall net income of the Bank or any branch, subsidiary or affiliate of the Bank, including a franchise tax based upon overall net income); or (c) impose on the Bank any penalty with respect to any of the foregoing or other condition with respect to this Agreement or the Credit Facility hereunder; or (d) impose any reserve, special deposits or similar requirements against the Credit Facility hereunder and the result of the foregoing is to increase the cost to the Bank of making or maintaining the Credit Facility or to reduce the amount of principal or interest received by the Bank, then the Borrower shall pay from time to time additional amounts which shall indemnify the Bank for such increased cost of maintaining the Credit Facility, including the loss resulting from any reduction in interest or principal received by the Bank under this Agreement.

## SECTION 3.  CONDITIONS PRECEDENT.

      The obligations of the Bank to make the Advances to the Borrower or other forms of credit or loan constituting the initial borrowing are subject to the satisfaction of the following conditions:

    3.1.    **Note**.

      There shall have been delivered to the Bank the Note duly completed and executed, in form and substance satisfactory to the Bank.

    3.2.    **Change in the Borrower's Condition.**

      There shall not have occurred or be threatened, (i) any material adverse change in the business, financial condition or operations of the Borrower or any Guarantor since the date of the most recent financial statements of the Borrower submitted to the Bank hereunder or in connection herewith; or (ii) any condition, event or act which would materially adversely affect the Borrower's business or its ability to repay any Advance.

    3.3.    **Authorization and Validity**.

      The Borrower has full legal right, requisite power and authority to borrow from the Bank under this Agreement and to execute, deliver and perform its obligations under this Agreement, the Note and all instruments, documents and agreements to which it is or will be a party and it has duly authorized by all requisite corporate action, the execution, delivery and performance of this Agreement, the Note and all such instruments, documents and agreements to which it is a party.

3.4.    **No Conflicts**.

The execution, delivery and performance by the Borrower of this Agreement and the Note and the payment by the Borrower of principal, interest and any other sums that may become due and owing under this Agreement and the Note do not: (i) conflict with the certificate of incorporation or by-laws of the Borrower; (ii) violate any provision of law, regulations, judgment, award, decree, order, writ, injunction or permit applicable to the Borrower; (iii) conflict with or result in default of the performance, observance or fulfillment of the material obligations, covenants, or agreements contained in any agreement or instrument to which the Borrower is a party or by which it or any of its properties or assets is bound; or (iv) constitute a breach of any restriction materially, adversely affecting its business, operation, creation or imposition of any lien, security interest, charge or encumbrance upon any property or assets of the Borrower.

3.5.    **No Adverse Pending Actions**.

There are no actions, suits or proceedings before any court, arbitral tribunal, governmental agency or administrative body pending or, to the best of the Borrower's knowledge, threatened against or affecting it which if adversely determined would materially adversely affect the financial condition of the Borrower or its operations or would materially impact any of its rights or abilities to perform its business as now conducted or as contemplated to be conducted or the financial ability of the Borrower to pay, when due, the principal of and interest on the Advance and any other sums that may become due and owing under this Agreement, the Note or any other document or instrument to which it is a party.

3.6.    **Representation and Warranties; No Default**.

The representations and warranties contained in Section 8 shall be true and correct on and as of the date of each granting of Advance. There shall, on the date of each granting of Advance, be no Default or Event of Default having occurred and be continuing, or that would result from such Advance; and the Borrower shall have immediately delivered to the Bank an officer's certificate, dated the date of each granting of Advance and upon the date of each occurrence of Event of Default to both such effects.

3.7.    **Credits Permitted by Applicable Laws**.

The Credit Facility from the Bank to the Borrower on the terms and conditions herein provided (including the use of the proceeds of the Credit Facility by the Borrower) shall not violate any applicable law or governmental regulation (including, without limitation, Regulations G, T, U and X of the Board of Governors of the Federal Reserve System) and shall not subject the Bank to any tax, penalty, liability or other onerous condition under or pursuant to any applicable law or governmental regulation, and the Bank shall have received such certificates or other evidence as it may request to establish compliance with this condition.

3.8.    **Proceedings.**

There shall have been delivered to the Bank:

(i)    satisfactory evidence that the Borrower is each duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation;

(ii)    certificates of the Secretary or Assistant Secretary of the Borrower, each dated the Closing Date, (a) attesting to all corporate action taken by such entity, including resolutions of its Board of Directors authorizing the execution, delivery and performance of this Agreement and each other document to be delivered pursuant to this Agreement, together with certified copies of the certificate or articles of incorporation and the by-laws of the Borrower; and such certificates shall state that the resolutions and corporate documents thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificates and (b) certifying the names and true signatures of the officers of such entity authorized to sign this Agreement and the other documents to be delivered by such entity under this Agreement; and

(iii)    certificates of duly authorized officers of the Borrower, dated the Closing Date, stating that the representations and warranties in Section 8 are true and correct on such date as though made on and as of such date and that no event has occurred and is continuing which constitutes a Default or Event of Default.

3.9.    **Guaranty.**

The unconditional continuing Guaranty of Payment duly executed by each Guarantor, Very-Tact International, Inc., a New York corporation ("VTII"), Wah Woon Tam a/k/a Wayne Tam, Sandy Liang and Jen-Hao Mao, shall be delivered upon execution of this Agreement which shall provide unconditional and irrevocable guarantee, as primary obligor and not merely as surety, of the full and prompt payment when due, by acceleration or otherwise (including, without limitation, any acceleration that results by operation of law upon the entry of an order for relief with respect to the Borrower under Title 11 (Bankruptcy) of the United States Code), and at all times thereafter, of all principal and interest on the Note and all other obligations of the Borrower to the Bank under this Agreement (the "Guaranteed Obligations"). The obligations of the Guarantor under this Section are unconditional irrespective of the genuineness, validity, regularity or enforceability of the Guaranteed Obligations and shall not be impaired by any action or omission to act, with or without notice to the Guarantor, of the Bank or any holder of the Note, including any amendment to, or any waiver of any condition or provision of, this Agreement, the extension or renewal for any period or periods or alteration of the Note or any amount payable thereunder, or under this Agreement, or any other circumstance which might otherwise constitute a discharge or defense of a Guarantor. Any holder of the Note may resort to the Guarantor for payment of any amount of principal or interest due and payable under the Note or any other Guaranteed Obligation, whether or not such holder shall have proceeded against the Borrower or any other obligor or any security or other property. The Guarantor hereby expressly waives (a) notice of the issuance of the Note or of acceptance of the Guaranty contained in this Section, (b) presentment, demand, notice of dishonor, protest and all other notices whatsoever and (c) all diligence in collection or protection

of or realization upon the Note or any security thereof. No payment by the Guarantor pursuant hereto on account of the Note or any other Guaranteed Obligation shall entitle it, by subrogation or otherwise, to any payment by or out of any property of the Borrower except after payment in full of the Note and all other Guaranteed Obligations. The obligations of the Guarantor under this Section shall continue to be effective, or shall be reinstated, as the case may be, if at any time any payment of any principal of or interest on the Note or any other Guaranteed Obligation is rescinded or must be otherwise returned by the Bank or the holder of the Note upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

3.10.   **Security and Collateral.**

As security for the Credit Facility, there shall have been delivered to the Bank for the duration of the Credit Facility or until the Note has been paid in full the following:

(i)   the General Security Agreement duly executed by the Borrower and VTII together with (a) Financing Statements on Form UCC-1 duly filed under the Uniform Commercial Code in all jurisdictions necessary or, in the opinion of the Bank desirable to perfect the first priority position Security Interest created by the General Security Agreement; and (b) lien search results identifying all of the financing statements on file with respect to the Borrower in all jurisdictions referred to under clause (a) hereof, indicating that, except for the Permitted Liens, no party claims an interest in any of the Collateral;

(ii)   the Negative Pledge Agreement duly executed by Wah Woon Tam a/k/a Wayne Tam, Jen-Hao Mao and Sandy Liang undertaking, covenanting and agreeing not to sell, dispose or creating any lien on their respective real properties listed in the Schedule A of the Negative Pledge Agreement duly executed by themselves;

(iii)   the Assignment Agreement duly executed by the Borrower to assign to the Bank all the Borrower's right, title and interest of accounts receivable proceeds to the extent available in and to all monies now due or which may hereafter become due to the Borrower under the Eligible Accounts Receivable; all monies due under the Eligible Accounts Receivable shall be remitted and deposited to a lock box account with the Bank; it being agreed that provided that the Borrower is not in default under this Agreement and the proceeds thereof is sufficient to satisfy the Borrower's monthly or periodical indebtedness under the Credit Facility.

3.11.   **Proof of Insurance.**

Prior to the initial Advance of the Credit Facility, the Bank shall have received a certificate of insurance from an independent insurance broker confirming the insurance required to be maintained pursuant to Section 4.3 hereof and naming the Bank as loss payee and additional insured thereunder.

### 3.12    Job Status Report and Field Audit of Accounts Receivable.

The Borrower shall submit to the Bank (i) the monthly job status report to be submitted following the month of work; and (ii) field audit of accounts receivable conducted by the Bank's appointed representative, at the costs and expenses of the Borrower, at least once a year.

### 3.13    Borrowing Base Certificate.

The Borrower shall submit to the Bank the duly completed and fully executed Borrowing Base Certificate or the Notice of Borrowing for the Advance with supporting documents in form and substance satisfactory to the Bank, to be submitted in advance before the succeeding months of requested Advance.

### Section 4.    Affirmative Covenants.

The Borrower covenants and agrees that so long as this Agreement is in effect and until the Note, together with interest and all other obligations of the Borrower incurred hereunder, is paid in full, the Borrower will:

### 4.1    Financial Statements.

Deliver to the Bank:

(i)    as soon as practicable, but in any event within **120 days** after the end of each fiscal year of the Borrower, a complete copy of C.P.A. reviewed consolidated annual financial statements of the Borrower, including the related reviewed statement of income, profit and loss statement, reconciliation of surplus statement, source and application of funds statement and shareholders equity for such year, and a balance sheet as of the end of such year, setting forth in each case in comparative form the corresponding figures for the previous fiscal year end, which shall be prepared in accordance with GAAP, applied on a consistent basis, and which shall be accompanied by a report thereon of an independent certified public accountant of recognized standing selected by the Borrower whose certificate shall be in scope and substance satisfactory to the Bank; however, the Bank may, at its sole discretion, require such final statements to be certified by a certified public accountant approved by the Bank;

(ii)    as soon as practicable, but in any event within **15 days** after filing of each year, a complete copy of C.P.A. prepared business income tax return of the Borrower and VTII ;

(iii)    as soon as practicable, but in any event within the following month, a copy of the interim monthly financial statements of the Borrower, including the related statement of income, profit and loss statement, and a balance sheet as of month end, and accompanied by a certificate to that effect executed by the President or an authorized officer of the Borrower;

14

(iv)   as soon as practicable, but in any event within the following month after the end of each month in each fiscal year, the monthly account receivable aging and account payable aging reports in form and substance satisfactory to the Bank, and other related statements of the Borrower as may be reasonably required by the Bank, and accompanied by a certificate to that effect executed by an authorized officer of the Borrower stating that the related receivable and payable are within the discretionary limit under the Collateral of the borrowing base formula as specified in Section 2.1 in this Agreement;

(v)   as soon as practicable, but in any event within **30 days** before the Expiration Date of the Credit Facility, the updated and signed copy of the personal financial statement and within 15 days after filing the signed copy of the most currently filed personal income tax return of each Guarantor;

(vi)   promptly upon transmission, thereof, copies of all such financial statements, proxy statements, notices and reports as the Borrower shall send to its shareholders and copies of all registration statements (without exhibits) and all reports which it files with the Securities and Exchange Commission (or any governmental body or agency succeeding to the functions of the Securities and Exchange Commission) if applicable shall be provided to the Bank; and

(vii)   promptly upon receipt thereof, a copy of any other report submitted to the Borrower by the independent certified public accountants in connection with any annual, interim or special audit made by them of the books of the Borrower.

Simultaneously with each delivery of the financial statements required by Subsections (i) (ii) (iii) and (iv) above, the Borrower shall submit to the Bank a certificate of the President or an authorized officer (a) certifying that no Default or Event of Default has occurred and is continuing, or, if a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto; and (iii) with computations demonstrating compliance with the covenants contained in Section 5. The Bank is hereby authorized to deliver a copy of any financial statement delivered to the Bank pursuant to this Section to any regulatory body having jurisdiction over the Bank.

4.2.   **Notice of Event of Default.**

Covenant that forthwith upon its President or authorized officer obtaining knowledge of a Default or an Event of Default, it shall deliver to the Bank as soon as possible and in any event within five (5) days after the occurrence of each Default or Event of Default, a written notice setting forth the details of such Default or Event of Default and the action which is proposed to be taken by the Borrower with respect thereto.

4.3.   **Maintenance of Insurance.**

At all times during the Commitment Period keep its insurable properties adequately insured and maintain the following insurances:

(i)   the property insurance with "All-Risk" and "Lender's Loss Payable Endorsement" coverage be maintained on the Borrower's furniture, fixtures, equipment, cargo and inventory located at its principal place of business and its warehouse(s) as reasonably approved by the Bank for the full replacement cost, and/or such other insurance as is customary with companies in the same or similar businesses, in an amount as the Bank may reasonably require or deem appropriate, naming the Bank as additional insured and loss payee;

(ii)   public liability insurance, which shall include product liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death or properties owned, occupied or controlled by it; and

(iii)   such other insurance as may be required by law or as may be reasonably required in writing by the Bank.

The Borrower shall provide to the Bank promptly upon receipt of written request thereof, evidence of the annual renewal of each such policy.

4.4.   **Maintenance of Bank Accounts.**

At all times during the Commitment Period maintain with the Bank all its transactional and operating account for deposits, transfer of proceeds and collection of accounts receivable.

4.5.   **Books and Records; Field Audit.**

Permit any person or auditor designated by the Bank in writing, at the Borrower's sole cost and expense, at least once a year, during business hours upon reasonably advanced notice, to visit and inspect the operation and any of the properties of the Borrower, including, but not limited to, the examination of the corporate books, inventory, accounts receivable, and accounting and financial records of the Borrower and its Subsidiaries and make copies thereof or extracts therefrom and to discuss the affairs, finances and accounts of any of such corporations with their respective executive officers or with their respective independent accountants.

4.6.   **Secure Notes Equally.**

If the Borrower creates or assumes any lien upon any of its property or assets, whether now owned or hereafter acquired, other than the Permitted Liens in Section 6.1 (unless prior written consent to the creation or assumption thereof shall have been obtained pursuant to Section 9.2), makes or causes to be made effective provisions whereby the Note will be further secured by such lien equally and ratably with any and all other debt thereby secured, then the

Advances under the Note shall also be so secured.

### 4.7.    **Litigation**.

Promptly after the Borrower becomes aware of the commencement thereof, notice of all actions (including, without limitation, derivative actions), suits, investigations, arbitration proceedings, and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting the Borrower or the Guarantor, including, without limitation, any such proceeding relating to any alleged violation of any Environmental Law, which, if determined adversely to the Borrower or the Guarantor, would have a material adverse effect on the financial condition, properties, or continued operations of the Borrower or such Guarantor or on the ability of any such entity to perform its obligations hereunder or under this Agreement and Credit Instruments.

### 4.8.    **Name, Address**.

Promptly provide written notice to the Bank if either the name or address of the Borrower is to be changed.

### 4.9.    **Deposits**.

Promptly deposit, pledge and assign all proceeds of accounts receivable, including, but not limited to, the Eligible Accounts Receivable proceeds, to the Borrower's current accounts maintained with the Bank. The Bank shall have the right, to the extent permitted by law, to apply those funds and proceeds deposited therein to repay or setoff the principal and interest of any outstanding Advance under the Credit Facility.

### 4.10.    **Financial Condition**.

Immediately notify the Bank if there is any material change in the financial conditions of the Borrower or the Guarantor.

### 4.11.    **Environmental Indemnification**.

The Borrower and each of the Guarantors shall indemnify and hold harmless the Bank, its parent company, subsidiaries and all of their directors, officers, employees, agents, attorneys, successors and assigns from and against any loss, damage, costs, expense or liability directly or indirectly arising out of or attributable to the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a Hazardous Substances on, under or about the property of the Borrower or any of its subsidiaries or operations or property leased to any of them, including, but not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). This indemnity shall survive repayment of all obligations to the Bank under any extension of the Credit Facility.

17

4.12.   **Assignment of Accounts Receivable**.

Assignment of the accounts receivable and proceeds of the Borrower to the Bank, in forms and substances as approved by the Bank, including, but not limited to proceeds of the Accounts Receivable as approved by the Bank shall be remitted directly to the Borrower's designated account with the Bank.

4.13.   **Ordinary Course of Business**.

The goods being shipped or services performed shall be in conformity with the ordinary course of business of the Borrower.

4.14.   **Not To Bid Below Costs**.

The Borrower represents, warrants and agrees that it will not bid on any projects or contracts below its costs at all time.

**Section 5. Financial Covenants**.

So long as the Note shall remain unpaid, or the Bank shall have any Commitment under this Agreement, the Borrower shall maintain the following financial covenants:

5.1.   **Tangible Net Worth**.

The Borrower shall maintain, at all times, the minimum adjusted Tangible Net Worth of not less than $1,000,000.00 (including the Subordinated Debt). The dollar amount so removed must be replaced by a form of capital acceptable to the Bank.

5.2.   **Debt to Net Worth Ratio**.

Maintain at all times during the term of this Agreement, a Debt to adjusted Net Worth Ratio not higher than 3:1 (including the Subordinated Debt).

5.3.   **Current Ratio**.

Maintain at all times during the terms of this Agreement, a Current Ratio not less than 1.2:1.

**Section 6.   Negative Covenants**.

The Borrower covenants and agrees that so long as this Agreement is in effect and until the Note, together with interest and all other obligations of the Borrower incurred hereunder are paid in full, the Borrower will not, and will not permit any Subsidiary without the Bank's prior written consent, to:

18

6.1.    **Lien Restrictions.**

Create, incur, assume or suffer to exist any Lien upon or with respect to any of its property or assets, whether now owned or hereafter acquired (whether or not provision is made for the equal and ratable securing of the Note in accordance with the provision of Section 4.6 hereof), except the following Permitted Lien:

(i)    Liens in favor of the Bank;

(ii)    Liens for taxes or assessments or other government charges or levies if not yet due and payable, or if due and payable if they are being actively contested in good faith by appropriate proceedings and for which appropriate reserves are maintained in conformity with GAAP;

(iii)    other Liens incidental to the conduct of the Borrower's business or the ownership of its property and assets which were not incurred in connection with the borrowing of money or the obtaining of advances or credit, and which do not in the aggregate materially detract from the value of its property or assets or materially impair the use thereof in the operation of its business;

(iv)    Liens on property or assets of a Subsidiary to secure obligations of such Subsidiary to the Borrower or another Subsidiary;

(v)    any Lien existing on any property of any corporation at the time it becomes a Subsidiary, or existing prior to the time of acquisition upon any property acquired by the Borrower or any Subsidiary through purchase, merger or consolidation or otherwise, whether or not assumed by the Borrower or such Subsidiary, or placed upon property at the time of acquisition by the Borrower or any Subsidiary to secure a portion of the purchase price thereof, provided that any such lien shall not encumber any other property of the Borrower or such Subsidiary;

(vi)    any Lien renewing, extending or refunding any Lien permitted by clause (iv) above, provided that the principal amount secured is not increased, and the Lien is not extended to other property; and

(vii)    Liens now or hereafter required by this Agreement.

6.2.    **Mergers, Consolidations, Sales.**

Be a party to any merger or consolidation, or purchase or otherwise acquire all or substantially all of the assets or stock of any class of, or any partnership or joint venture interest in, any other person or entity, or, except in the ordinary course of its business, sell, transfer, convey or lease all or any substantial part of its assets, or sell or assign with or without recourse any receivables, except for any such merger or consolidation, sale, transfer, conveyance, lease or assignment of or by any wholly-owned Subsidiary into the Borrower or into, with or to any other

19

wholly-owned Subsidiary.

### 6.3.    Guaranties, Loans or Advances.

Become or be a guarantor or surety of, or otherwise become or be responsible in any manner directly, contingently or otherwise (whether by agreement to purchase any obligations, stock, assets, goods or services, or to supply or advance any funds, assets, goods or services, or otherwise) with respect to, any undertaking of any other person or entity, or make or permit to exist any loans or advances to any other person or entity, except for those existing prior to the date of this Agreement.

### 6.4.    Financing or Capital Investments.

Provide any financing to any of its shareholders, principals, related parties, Subsidiaries or Affiliates, or make any capital investments in any fiscal year during the term of this Agreement.

### 6.5.    Loan Restrictions.

Borrow, create or incur any additional loan, credit facility, or financial liability with other Person, or lending institutions except the normal trade credits in the Borrower's ordinary course of business without the prior written consent of the Bank.

### Section 7.  Events of Default.

### 7.1.    Events of Default.

(i)    the Borrower defaults in the payment of the principal of the Note or any loans, advances and other indebtedness when the same shall become due, either at maturity or by acceleration or otherwise as herein provided; or

(ii)    the Borrower defaults in the payment of any interest on the Note or any loans, advances and other indebtedness or of any fee when the same shall become due; or

(iii)    the Borrower or any Subsidiary or any Guarantor defaults in any payment of principal of, or interest on, any other obligation for money borrowed (or any obligation under conditional sale or other title retention agreement or any obligation issued or assumed as full or partial payment for property whether or not secured by purchase money mortgage or any obligation under notes payable or drafts accepted representing extension of credit) beyond any period of grace provided with respect thereto, or defaults in the performance or observance of any other agreement, term or condition contained in any agreement under which any such obligation is created (or if any other default under any such agreement shall occur and be continuing) and the effect of such default is to permit the holder or holders of such obligation (or a trustee on behalf of such holder or holders) to cause such obligation to become due prior to its stated maturity; or

(iv)    any representation or warranty made by the Borrower herein or in any writing furnished in connection with or pursuant to this Agreement shall contain material omissions or be false in any material respect on the date as of which made; or

(v)    the Borrower defaults in the performance or observance of any other agreement, term or condition contained herein and such default shall not have been remedied within 30 days after written notice thereof shall have been received by the Borrower from the Bank; or

(vi)    the Borrower, any Subsidiary or any Guarantor makes an assignment for the benefit of creditors or is generally not paying its debts as such debts become due; or

(vii)    any order, judgment or decree is entered under the bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment of debt, dissolution or liquidation or similar laws (hereinafter called the "Bankruptcy Law") of any jurisdiction adjudicating the Borrower, any Subsidiary or any Guarantor bankrupt or insolvent; or

(viii)    the Borrower, any Subsidiary or any Guarantor petitions or applies to any tribunal for, or consents to, the appointment of, or taking possession by, a trustee, receiver, custodian, liquidator or similar official, of the Borrower or any Subsidiary, or of any substantial part of the assets of the Borrower or any Subsidiary, or commences a voluntary case under the Bankruptcy Law of the United States or any proceedings (other than proceedings for the voluntary liquidation or dissolution of a Subsidiary) relating to the Borrower or any Subsidiary under the Bankruptcy Law of any other jurisdiction, whether now or hereafter in effect; or

(ix)    any such petition or application is filed, or any such proceedings are commenced, against the Borrower or any Subsidiary or any Guarantor and the Borrower or any Subsidiary or any Guarantor by any act indicates its approval thereof, consent thereto or acquiescence therein, or an order for relief is entered in an involuntary case under the Bankruptcy Law of the United States, as now or hereafter constituted, or an order, judgment or decree is entered appointing any such trustee, receiver, custodian, liquidator or similar official, or approving the petition in any such proceedings, and such order, judgment or decree remains unstayed and in effect for more than 30 days; or

(x)    any order, judgment or decree is entered in any proceedings against the Borrower decreeing the dissolution of the Borrower and such order, judgment or decree remains unstayed and in effect for more than 30 days; or

(xi)    failure to supply the Bank promptly with any information, documentation or agreement it may reasonably require; or

(xii)    failure to perform any agreement or obligation owing to a third party or to pay when due any Indebtedness to any third party for which the Borrower is liable, contingently or otherwise, whether such Indebtedness is accelerated or is required to be paid prior to its stated maturity, the non-performance or non-payment of which should have, at the Bank's sole and absolute discretion, an adverse effect on the business, operation or financial status of the Borrower or the

21

ability of the Borrower to perform its obligations under this Agreement, or any lien is levied against the Borrower's assets; or

   (xiii) the Bank for any reason ceases to have a valid, enforceable and perfected Security Interest or lien upon any of the collateral of the Borrower described herein; or

   (xiv) the Borrower or any Guarantor ceases to exist, dissolves, dies or becomes incompetent, or any action is commenced by or against the Borrower or any Guarantor to accomplish any of the foregoing; or

   (xv) any adverse change in the security of the Credit Facility or in the financial condition of the Borrower or any Guarantor or the ability of the Borrower or any Guarantor to perform their obligations under this Agreement, in the sole opinion of the Bank.

 7.2. **Remedies.**

   If any Event of Default shall occur and be continuing, the Bank shall, by notice to the Borrower, take any one or more of the following actions:

   (i) declare the Commitment to be terminated, whereupon the same shall forthwith immediately terminate, and no further utilization of the Credit Facility shall be permitted;

   (ii) declare all outstanding principal of the Note, all interest thereon and all other amounts payable under this Agreement and the Note to be forthwith due and payable; whereupon the Note, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower;

   (iii) set-off against, appropriate and apply to any obligation of the Borrower to the Bank any debt owing from the Bank to the Borrower (whether or not then due), including without limitation, any deposit by the Borrower with the Bank (including any of its branches); or

   (iv) exercise any other remedy available to the Bank by law or in equity.

   **Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.**

   The Borrower shall pay all expenses of the Bank incurred in connection with the enforcement of this Agreement and collection and enforcement of the Note, including, without limitation, the fees and expenses of any counsel, consultants or advisors for the Bank. The rights and remedies provided the Bank hereunder are cumulative and not exclusive of any other rights or remedies available to the Bank under law. To the extent permitted by law, the Bank's rights may be exercised concurrently or separately and the exercise of any one remedy shall not be deemed to be an exclusive election of such remedy or to preclude the exercise of any other remedy.

7.3.    **Remedies Cumulative**.

Each and every power and remedy herein specifically given to the Bank or otherwise in this Agreement or any other agreements shall be cumulative and shall be in addition to any other power and remedy herein specifically given or now or hereafter existing at law, in equity, or by statute and each and every power and remedy whether specifically in this Agreement or in any other agreements, given or otherwise existing may be exercised from time to time and as often and in such order as may be deemed expedient by the Bank and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be an election of such power or remedy to the exclusion of any other, or a waiver of the right to exercise at the same time or thereafter any other power or remedy. No delay or omission by the Bank in the exercise of any right or power or in the pursuance of any remedy accruing upon any Event of Default shall impair any such right, power or remedy or be construed to be a waiver of any such event of default or to be an acquiescence therein; nor shall the acceptance by the Bank of any security or of any payment of or on account of any installment of principal of, or interest on, the Note maturing after any Event of Default or of any payment on account of any past Event of Default be construed to be a waiver of any right to take advantage of any future Event of Default or of any past Event of Default not completely cured thereby. The Bank may waive any Event of Default by written notice to that effect to the Borrower, but no such waiver shall extend to or affect any subsequent or other Event of Default or impair any rights or remedies consequent thereon.

**Section 8.  Representations, Covenants and Warranties.**

The Borrower represents, covenants and warrants:

8.1.    **Incorporation, Good Standing and Due Qualification: Compliance with Law.**

The Borrower is duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, as the case may be, has the corporate power and authority to own its assets and to transact the business in which it is now engaged or proposed to be engaged, and is duly qualified as a foreign corporation, and in good standing under the laws of each other jurisdiction in which such qualification is required except where the failure to so qualify and/or be in good standing would not, in any case or in the aggregate, have a material adverse effect on the operations, business, property or financial condition of such entity or on the ability of such entity to perform its obligations hereunder. In addition, the Borrower is in compliance with all laws, treaties, rules or regulations, or determination of an arbitration or a court or other governmental authority, in each case applicable to or binding upon it or any of its material property or to which it or any of its material property is subject, except to the extent that the failure to so comply would not, in any case or in the aggregate, have a material adverse effect on the operations, business, property or financial condition of such entity or on the ability of such entity to perform its obligations under this Agreement.

8.2.    **Power and Authority: No Conflicts.**

The execution, delivery and performance by the Borrower of this Agreement have been duly authorized by all necessary corporate action and do not and will not (i) require any consent or approval of its shareholders; and (ii) contravene its charter or by-laws.

8.3.    **Legally Enforceable Agreements.**

Each Credit Instrument is, or when delivered under this Agreement will be, a legal, valid and binding obligation of the Borrower and each Guarantor (to the extent they are parties thereto) enforceable against such Person in accordance with its terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally.

8.4.    **Operation of Business.**

The Borrower possesses all licenses, permits, franchises, patents, copyrights, trademarks and trade names, or rights thereto, to conduct its business substantially as now conducted and as presently proposed to be conducted except where the failure to do so would not, in any case or in the aggregate, have a material adverse effect upon the operations, business, property or financial condition of the Borrower or on the ability of any such entity to perform its obligations under this Agreement.

8.5.    **Hazardous Substances.**

The Borrower and the Guarantors are in compliance with all Environmental Laws, and has obtained all necessary licenses and permits required to be issued pursuant to any Environmental Law, with which the failure to so comply or obtain, as the case may be, would not, individually or in the aggregate, have a material adverse effect on the Borrower or the Guarantors. Neither the Borrower, nor any Guarantor has received any notice or communication from any governmental agency with respect to (i) any Hazardous Substance relative to its operations, property of acts or (ii) any investigation, demand or request pursuant to or enforcing any Environmental Law relating to it or its operations, no such investigation is pending or threatened.

8.6.    **No Default on Outstanding Judgments or Orders.**

The Borrower and each of the Guarantors has satisfied all judgments and neither the Borrower nor the Guarantor is in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court, arbitrator or federal, state, municipal or other governmental authority, commission, board, bureau, agency or instrumentality, domestic or foreign.

8.7.    **No Defaults on Other Agreements.**

Neither the Borrower nor any Guarantor is a party to any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to any charter or corporate

24

restriction which would in any case or in the aggregate have a material adverse effect on its ability to carry out its obligations under this Agreement or the business, properties, assets, operations or condition, financial or otherwise, of the Borrower or any of the Guarantors. Neither the Borrower nor the Guarantor is in default in any respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument material to its business to which it is a party except where such default would not, in any case or in the aggregate, have a material adverse effect on the business, properties, assets, operations or conditions, financial or otherwise of the Borrower or any Guarantor or on the ability of the Borrower or any Guarantor to perform its obligations under this Agreement.

8.8.    **No Default or Event of Default.**

No Default or Event of Default has occurred and is continuing.

8.9.    **Accounts Receivable.**

Each account receivable shown on each Borrowing Base Certificate shall be based upon an actual bona fide sale and shipment of delivery of goods or rendition of services to customers, made by the Borrower in the ordinary course of its business; the goods and inventory being sold and the accounts thereby created by services being rendered are the exclusive property of the Borrower and are not and shall not be subject to any Lien (other than Permitted Liens hereunder), the customers of the Borrower have accepted such goods or services and owe and are obligated to pay the full amount stated in the invoices according to their terms, without dispute, offset, defense or counterclaim.

8.10.    **Solvency.**

The Borrower and each of the Guarantors are solvent.

8.11.    **Material Adverse Change.**

No event or series of events has occurred which would result in a material adverse effect on the operations, business, property or financial condition of the Borrower or any of the Guarantors or on the ability of any of such entities to perform its obligations.

8.12.    **Actions Pending.**

There is no action, suit, investigation or proceeding pending or, to the knowledge of the Borrower, threatened against the Borrower or any Guarantor, or any properties or rights of the Borrower or any Guarantor before any court, arbitrator or administrative or governmental body which might result in any material adverse change in the operations, business, property or financial condition of the Borrower or any of the Guarantor.

### 8.13.    Title to Properties.

The Borrower has and each of its Subsidiaries has good and marketable title to all of its respective properties and assets, including the properties and assets reflected in the balance sheet hereinabove described (other than properties and assets disposed of in the ordinary course of business) subject to no lien of any kind. The Borrower and its Subsidiaries enjoy peaceful and undisturbed possession of all leases necessary in any material respect for the operation of their respective properties and assets, none of which contains any unusual or burdensome provisions which might materially affect or impair the operation of such properties and assets. All such leases are valid and subsisting and are in full force and effect.

### 8.14.    Taxes.

The Borrower and each of the Guarantors have filed all federal, state and other income and other tax returns which, to the best knowledge of the officers of the Borrower, are required to be filed, and each has paid all taxes as shown on said returns and on all assessments received by it to the extent that such taxes have become due. There is no tax, levy, impost, deduction, charge or withholding imposed by any governmental or taxing authority either (a) on or by virtue of the execution or delivery of this Agreement or the Note, or any other document to be furnished hereunder or, (b) on any payment of principal, interest, fees or other amounts to be made pursuant to this Agreement.

### 8.15.    Conflicting Agreements and Other Matters.

Neither the Borrower nor any of its Subsidiaries is a party to any contract or agreement or subject to any charter or other corporate restriction which materially and adversely affects its operations, business, property or financial condition. Neither the execution nor delivery of this Agreement or the Note, nor fulfillment of, nor compliance with the terms and provisions hereof and of the Note will conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or violate any covenants of, or result in any violation of, or result in the creation of any lien upon any of the properties or assets of the Borrower or any of its Subsidiaries, any agreement (including any agreement with shareholders), or any award of any arbitrator, instrument, order, judgment, decree, statute, law, rule or regulation to which the Borrower or any of its Subsidiaries is subject. Neither the Borrower nor any of its Subsidiary is a party to, or otherwise subject to any provision contained in, any instrument evidencing Indebtedness of the Borrower or such Subsidiary, any agreement relating thereto or any other contract or agreement (including its charter) which restricts or otherwise limits the incurring of the debt to be evidenced by this Agreement or the Note.

### 8.16.    Securities Acts.

Neither the Borrower nor any agent acting on its behalf has, directly or indirectly, taken or will take any action which would subject the issuance of the Note to the provisions of Section 5 of the Securities Act of 1933, as amended, or to the provisions of any securities or Blue Sky Law of any applicable jurisdiction.

### 8.17.    Regulation G, Etc.

Neither the Borrower nor any of its Subsidiary is engaged principally, or as one of its important activities, in the business of, extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation G or U of the Board of Governors of the Federal Reserve System). Neither the Borrower nor any agent acting on its behalf has taken or will take any action which might cause this Agreement or the Note to violate Regulation G, T, U or X or any other regulation of the Board of Governors of the Federal Reserve System or to violate the Securities Exchange Act of 1934, in each case as in effect now or as the same may hereafter be in effect.

### 8.18.    Governmental Consent.

Neither the nature of the Borrower or of any of its Subsidiary, nor any of their respective businesses or properties nor any relationship between the Borrower or any Subsidiary and any other person, nor any circumstance in connection with the Advances or the issuance and delivery of the Note is such as to require any consent, approval or other action by or any notice to or filing with any court or administrative or governmental body (other than routine filings after the date of any closing with the Securities and Exchange Commission and/or State Blue Sky authorities) in connection with the execution and delivery of this Agreement, any Credit granted under this Agreement, or the issuance and delivery of the Note or fulfillment or compliance with the terms and provisions hereof or of the Note.

### 8.19.    Holding Company Status.

The Borrower is not a holding company, or a subsidiary or affiliate of a holding company, or a public utility, within the meaning of the Public Utility Holding Company Act of 1935, as amended, or a public utility within the meaning of the Federal Power Act, as amended.

### 8.20.    Investment Company Status.

The Borrower is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended or an "investment adviser" within the meaning of the Investment Advisers Act of 1940, as amended.

### 8.21.    Encumbrances.

Except for any prior Security Interest held by the Bank, none of the properties or assets of the Borrower is subject to any encumbrance and no obligations of the Borrower have any priority, or are subject to any preferential arrangement, whether or not constituting a security agreement, in favor of any creditor or class of creditors, the repayment of principal or interest, or the right to receive income or revenue.

## SECTION 9. MISCELLANEOUS.

### 9.1. Expenses.

The Borrower agrees, whether or not the transactions hereby contemplated shall be consummated, to pay, and keep the Bank harmless against liability for the payment of all out-of-pocket expenses arising in connection with this transaction, all taxes, together in each case with interest and penalties, if any, and any income tax payable by the Bank in respect of any reimbursement therefor, which may be payable in respect of the execution, delivery and performance of this Agreement or the execution, delivery, acquisition and performance of any Note (excepting only any tax on or measured by net income of the Bank determined substantially in the same manner, other than the rate of tax, as net income is presently determined under the Code), all printing costs and the reasonable fees and expenses of any special counsel to the Bank in connection with this Agreement and any subsequent modification thereof or consent thereunder and in connection with the enforcement of this Agreement. The obligations of the Borrower under this Section shall survive payment of all amounts due under the Note.

### 9.2. Consent to Amendments.

This Agreement may be amended, and the Borrower may take any action herein prohibited, or omit to perform any act herein required to be performed by it, if the Borrower shall obtain the Bank's prior written consent to such amendment, action or omission to act. Each holder of the Note at the time or thereafter outstanding shall be bound by any consent authorized by this Section, whether or not such Note shall have been marked to indicate such consent, but any note or Borrowings under the Note issued thereafter may contain a reference, or bear a notation referring, to any such consent. No course of dealing between the Borrower and the holder of the Note nor any delay in exercising any rights hereunder or under the Note shall operate as a waiver of any rights of any holder of such Note. As used herein and in the Note, the term "this Agreement" and references thereto shall mean this Agreement as it may, from time to time, be amended or supplemented.

### 9.3. Survival of Representations and Warranties.

All representations and warranties contained herein or made in writing by the Borrower in connection herewith shall survive the execution and delivery of this Agreement and of the Note and payment of the Note, regardless of any investigation made by the Bank or on its behalf.

### 9.4. Successors and Assigns.

All covenants and agreements in this Agreement contained by or on behalf of either of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not.

9.5.   **Notices; E-Business Acknowledgment.**

Except as otherwise expressly provided in this Agreement, any notice required or desired to be served, given or delivered hereunder shall be in writing, and shall be deemed to have been validly served, given or delivered (a) upon receipt if deposited in the United States mails, first class mail, with proper postage prepaid, (b) upon receipt of confirmation or answerback if sent by telecopy, or other similar facsimile transmission, (c) one Business Day after deposit with a reputable overnight courier with all charges prepaid, or (d) when delivered, if hand-delivered by messenger, all of which shall be properly addressed to the party to be notified and sent to the address or number indicated as follows:

to the Bank:

| | |
|---|---|
| Cathay Bank, Flushing Office | Cathay Bank, Corporate Office |
| 40-14/16 Main Street, | 777 North Broadway |
| Flushing, New York 11354 | Los Angeles, CA 90012 |
| Attention:  Pin Tai, General Manager | Attention: Anthony Tang, SEVP |

to the Borrower:

United Aluminum Door Inc.
267 Vandervoort Avenue
Brooklyn, New York 11211
Attention:   Wah Woon Tam, President

or to such other address or number as each party designates to the other in the manner prescribed herein.

Each party may electronically transmit to or receive from the other party certain documents ("E-Documents") via the Internet or electronic data interchange ("EDI"). Any transmission of data which is not an E-Document shall have no force or effect between the parties. EDI transmissions may be sent directly or through any third party service provider ("Provider") with which either party may contract. Each party shall be liable for the acts or omissions of its Provider while handling E-Documents for such party, provided, that if both parties use the same Provider, the originating party shall be liable for the acts or omissions of such Provider as to such E-Document. Some information to be made available to the Borrower will be specific to the Borrower and will require the Borrower's registration with the Bank before access is provided. After the Bank has approved the registration submitted by the Borrower, the Bank shall provide an ID and password(s) to an individual designated by the Borrower (the "Borrower Recipient"). The Borrower accepts responsibility for the designated individual's distribution of the ID and password(s) within its organization and the Borrower will take reasonable measures to ensure that passwords are not shared or disclosed to unauthorized individuals. The Borrower will conduct an annual review of all IDs and passwords to ensure they are accurate and properly authorized. **THE BANK MAY CHANGE OR DISCONTINUE USE OF AN ID OR PASSWORD AT ITS DISCRETION AT ANY TIME.** E-Documents shall not be deemed to have been properly received, and no E-

29

Document shall give rise to any obligation, until accessible to the receiving party at such party's receipt computer at the address specified herein. Upon proper receipt of an E-Document, the receiving party shall promptly transmit a functional acknowledgment in return. A functional acknowledgment shall constitute conclusive evidence that an E-Document has been properly received. If any transmitted E-Document is received in an unintelligible or garbled form, the receiving party shall promptly notify the originating party in a reasonable manner. In the absence of such a notice, the originating party's records of the contents of such E-Document shall control.

Each party shall use those security procedures which are reasonably sufficient to ensure that all transmissions of E-Documents are authorized and to protect its business records and data from improper access. Any E-Document received pursuant to this Section shall have the same effect as if the contents of the E-Document had been sent in paper rather than electronic form. The conduct of the parties pursuant to this Section shall, for all legal purposes, evidence a course of dealing and a course of performance accepted by the parties. The parties agree not to contest the validity or enforceability of E-documents under the provisions of any applicable law relating to whether certain agreements are to be in writing or signed by the party to be bound thereby. The parties agree, as to any E-Document accompanied by the Borrower's ID, that the Bank can reasonably rely on the fact that such E-Document is properly authorized by the Borrower. E-Documents, if introduced as evidence on paper in any judicial, arbitration, mediation or administrative proceedings, will be admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Neither party shall contest the admissibility of copies of E-documents under either the business records exception to the hearsay rule or the best evidence rule on the basis that the E-Documents were not originated or maintained in documentary form.

9.6.    **Descriptive Headings.**

The descriptive headings of the several Sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

9.7.    **Right of Set-off.**

Upon the occurrence and during the continuance of any Event of Default, the Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final), at any time held and other Indebtedness at any time owing by the Bank to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or the Note and although such obligations may be unmatured. The Bank agrees to promptly notify the Borrower after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Bank under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Bank may have.

### 9.8.    Satisfaction Requirement.

If any agreement, certificate or other writing, or any action taken or to be taken, is by the terms of this Agreement required to be satisfactory to the Bank, the determination of such satisfaction shall be made by the Bank in its sole and exclusive judgment exercised in good faith.

### 9.9.    Third Party Claims.

In case of the assertion in writing of any claim initiated or asserted by any person, firm, governmental authority or corporation other than the Bank (a "Third Party Claim") or the commencement of any litigation asserting a Third Party Claim which may give rise to any obligation of the Borrower to the Bank under the provisions of this Section, the Bank shall give notice thereof as provided hereunder as promptly as practicable after the Bank's receipt of such written assertion or the commencement of such litigation unless the failure to give such notice would not materially prejudice the Borrower (such notice to be given by the Bank not later than would materially prejudice the Borrower if it chose to defend such litigation as hereinafter provided). If the Borrower demonstrates to the Bank that the Borrower will be able to pay the full amount of potential liability in connection with any Third Party Claim, the Borrower may, at its sole cost and expense, upon written notice given to the Bank within thirty (30) days after its receipt of the Bank's notice under this Section, assume the defense, with counsel reasonably satisfactory to the Bank, of any such Third Party Claim or litigation, provided that the Borrower confirms in writing to the Bank the applicability of its indemnity to such Third Party Claim and the Borrower's sole liability (as between the Bank and the Borrower) with respect to all material elements of such Third Party Claim. If the Borrower assumes the defense of any such claim or litigation, the obligations of the Borrower hereunder as to such claim or litigation shall be limited to taking all steps necessary in the defense or settlement thereof and to holding the Bank harmless from and against any and all losses, liabilities, expenses and damages caused by or arising out of any settlement approved by the Borrower or any judgment in connection with such claim or litigation and the Bank shall make available to the Borrower such books and records in the Bank's possession as the Borrower may reasonably require in connection with such defense. Except with the express prior written consent of the Bank, the Borrower shall not consent to the settlement or entry of any judgment arising from any such claim or litigation which in each case does not include as an unconditional term thereof the giving by the claimant or plaintiff, as the case may be, to the Bank of any unconditional release from all liability in respect thereof unless the Borrower has actually paid the full amount of any such settlement or judgment.  The Bank shall be entitled to be consulted about (but not control) the defense of, and receive copies of all pleadings and other material papers in connection with, any such claim or litigation. If the Borrower does not assume the defense of any such claim or litigation, the Bank may defend the same in such manner as it may deem appropriate, including but not limited to, settling such claim or litigation after giving reasonable notice of the same to the Borrower on such terms as the Bank may deem appropriate, and the Borrower will promptly reimburse the Bank in accordance with the provisions of this Section, provided that the Bank shall provide the Borrower with copies of all pleadings and other material documents in connection with any such claim or litigation and that the Borrower is consulted about (albeit not in control of) such litigation. Anything contained in this Section to the contrary notwithstanding, (a) the Borrower shall not be entitled to assume the defense of any such claim or litigation if the Third Party Claim seeks an order, injunction

31

or other equitable relief against the Bank; and (b) the Bank may defend any Third Party Claim to which the Bank may have a defense or counterclaim which the Borrower is not entitled to assert to the extent necessary to assert and maintain such defense or counterclaim, provided that, in either event, the Bank shall provide the Borrower with copies of all pleadings and other material documents in connection with any such claim or litigation and that the Borrower is consulted about (albeit not in control of) such litigation.

### 9.10.   Jurisdiction and Consent to Service of Process.

(i)    The Borrower hereby irrevocably and unconditionally submit, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may by enforced in order jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Bank may otherwise have to bring any action or proceeding relating to this Agreement or any other loan document against the Borrower or its properties in the courts of any jurisdiction.

(ii)   The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other loan document in any court referred to in Subsection (i) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(iii)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.5. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

### 9.11.   Waiver of Jury Trial.

THE BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IN WHICH THE BANK SHALL BE AN ADVERSE PARTY, AND THE BORROWER, IN ADDITION, WAIVES THE RIGHT TO INTERPOSE ANY DEFENSE BASED UPON ANY STATUTE OF LIMITATIONS OR ANY CLAIM OF LACHES AND ANY SET-OFF OR COUNTERCLAIM OF ANY NATURE OR DESCRIPTION IN ANY SUCH LITIGATION.

EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

9.12.  **Arbitration.**

The Borrower and the Guarantor agree that all disputes, claims and controversies between them, whether individual, joint, or class in nature, arising from this Agreement, the Note, the Guaranty, or any other loan document, including without limitation contract and tort disputes, may be arbitrated pursuant to the Rules of the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules and Supplemental Procedures for Financial Services Disputes, upon sole request of the Bank. No act to take or dispose of any collateral securing the Note or guaranty shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any collateral securing the Note or guaranty, including any claim to rescind, reform, or otherwise modify any agreement relating to the collateral securing the Note or Guaranty shall also be arbitrated, provided, however, that no arbitrator shall have the right or the power to enjoin or restrain any act of any party.

The arbitrators shall not have power to make an award of $1,000,000.00 or more against any party to an arbitration and the parties specifically reserve the right, upon a petition to vacate, to have any such award reviewed and vacated upon the same grounds as would result in reversal on appeal from a judgment after trial by court. Nothing in this Agreement, the Note or Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes.

The Bank, the Borrower and the Guarantor agree that in the event of an action for foreclosure of any collateral, whether or not real property or personal property, pursuant to the laws or in the jurisdiction where the collateral located, the commencement of such an action will not constitute a waiver of the right to arbitrate and the court shall refer to arbitration as much of such action, including counterclaims, as lawfully may be referred to arbitration. judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction.

33

To the extent not provided by this Agreement, including the Rules incorporated herein, arbitration hereunder shall be governed by New York arbitration law. Arbitration shall be conducted in the City of New York, New York, in English and, unless otherwise agreed to by the parties with respect to a particular dispute, shall be heard by a panel of three arbitrators. The arbitrators in any arbitration shall be experienced in the areas of law raised by the subject matter of the dispute. Lists of prospective arbitrators shall include retired judges. Notwithstanding the AAA rules, (a) any party may strike from a list of prospective arbitrators any individual who is regarded by that party as not appropriate for the dispute; and (b), if the arbitrator appointment cannot be made from the initial list of prospective arbitrators circulated by the AAA, a second and, if necessary, a third list shall be circulated and exhausted before the AAA is empowered to make the appointment.

The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

9.13.    **Delay**.

No delay or omission by the Bank in the exercise of any right or power or in the pursuance of any remedy accruing upon any Event of Default shall impair any such right, power or remedy or be construed to be a waiver of any such event of default or to be an acquiescence therein; nor shall the acceptance by the Bank of any security or of any payment of or on account of any installment of principal of or interest on the Note maturing after any Event of Default or of any payment on account of any past Event of Default be construed to be a waiver of any right to take advantage of any future Event of Default or of any past Event of Default not completely cured thereby. The Bank may waive any Event of Default by written notice to that effect to the Borrower, but no such waiver shall extend to or affect any subsequent or other Event of Default or impair any rights or remedies consequent thereon.

9.14.    **Table of Contents, Headings**.

Any table of contents and the headings and captions hereunder are for convenience only and shall not affect the interpretation or construction of this Agreement.

9.15.    **Severability**.

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or enforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

9.16.    **Offsets, Counterclaims and Defenses**.

The Borrower will not claim or demand or be entitled to any offsets, counterclaims or defenses of any nature whatsoever which the Borrower may have against the Bank and no such offsets, counterclaims or defenses shall be interposed or asserted by the

Borrower in any action or proceeding brought by the Bank and any such right to interpose or assert any such offsets, counterclaims or defenses in any such action or proceeding is hereby expressly waived by the Borrower.

### 9.17. Cross Default and Cross Collateralized.

Either the Borrower or the Guarantor may from time to time have other loan obligations to the Bank. All loans and/or credit facilities between the Borrower, or the Guarantor, and the Bank shall be cross-defaulted, and the collateral under the respective loan or credit facility shall be cross collateralized, so that a default in any loan obligation to the Bank shall be a default in all loan obligations to the Bank. In connection therewith, the Bank shall have the right, at its sole and absolute discretion, to collect against, hold or withhold the Collateral or the Security Interest hereunder, until the full payment and satisfaction of all loans and/or credit facilities between the Borrower, or the Guarantor, and the Bank.

### 9.18. Further Assurances.

The Borrower shall execute and deliver all such other documents and agreements and take all such other actions at its own cost and expense as the Bank or its counsel shall from time to time request in order to assure the Bank of the benefits of the rights granted to the Bank under this Agreement or any other agreements.

### 9.19 Preparation of Agreement; Costs and Expenses.

This Agreement was prepared by the Bank solely on behalf of the Borrower. The Borrower acknowledges that: (i) it had the advice of, or sufficient opportunity to obtain the advice of, legal counsel separate and independent of legal counsel for any other party hereto; (ii) the terms of the transactions contemplated by this Agreement are fair and reasonable to the Borrower; and (iii) the Borrower has voluntarily entered into the transactions contemplated by this Agreement without duress or coercion. The Borrower further acknowledges that it was not represented by the legal counsel of the Bank or any other party hereto in connection with the transactions contemplated by this Agreement, nor was it under any belief or understanding that such legal counsel was representing its interests. Except as expressly set forth in this Agreement, the Borrower shall pay all legal and other costs and expenses incurred or to be incurred by the Bank in negotiating and preparing this Agreement; in performing due diligence or retaining professional advisors; in performing any transactions contemplated by this Agreement; or in complying with the Borrower's covenants, agreements and conditions contained herein. Each party agrees that no conflict, omission or ambiguity in this Agreement, or the interpretation thereof, shall be presumed, implied or otherwise construed against any other party to this Agreement on the basis that the Bank was responsible for drafting this Agreement.

35

9.20.    **Counterparts.**

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

9.21.    **Governing Law.**

This Agreement shall be construed in accordance with and governed for all purposes by the substantive law and public policy of the State of New York applicable to contracts made and to be wholly performed in that State.

9.22.    **Entire Agreement.**

This Agreement and the documents referred to herein constitute the entire agreement of the parties hereto with respect to the subject matter hereof and shall supersede any prior expressions of intent or understandings with respect to this transaction.

**IN    WITNESS    WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the date and year first above written.

BANK:

CATHAY BANK, FLUSHING OFFICE

By: _____

PIN TAI, General Manager

BORROWER:

(Corporate Seal)                        UNITED ALUMINUM DOOR INC.

Attest:

_____        By: _____

SANDY LIANG, Secretary                JEN-HAO MAO, Treasurer

36

## REVOLVING NOTE

**$1,500,000.00**                                   September 15, 2000
                                                    New York, New York


 **FOR VALUE RECEIVED, UNITED ALUMINUM DOOR INC.**, a New York corporation, having its principal place of business at 267 Vandervoort Avenue, Brooklyn, New York 11211 (the "Borrower") promises to pay to the order of **CATHAY BANK, FLUSHING OFFICE** (the "Bank") at the Bank's office, 40-14/16 Main Street, Flushing, New York 11354, the principal sum of **ONE MILLION FIVE HUNDRED THOUSAND and 00/100 ($1,500,000.00) DOLLARS**, or, so much thereof as shall have actually been advanced and/or readvanced by the Bank to or on behalf of the Borrower pursuant to the Credit Agreement, together with interest on the unpaid principal amount outstanding from time to time as hereinafter set forth and all other obligations of the Borrower to the Bank under the Credit Agreement, in lawful money of the United States of America, on or before **September           , 2001** (the "Expiration Date").

 The Borrower promises also to pay the Bank interest monthly on the Payment Date, computed on the basis of actual days outstanding during the month (plus, with respect to interest on payments of principal, the number of days after such month to but not including the payment day, a year of 360 days), as provided in the Credit Agreement, in like money, at such office: (i) from the date each Advance is made until such principal amount is paid in full on Expiration Date (whether by acceleration or otherwise) at the Interest Rate equal at all times to one (1%) percent above the Wall Street Journal Prime Rate, any change in the Interest Rate shall take effect simultaneously with the corresponding change in the Prime Rate; and (ii) from the maturity of each Advance until paid or after and during the continuance of an Event of Default (as defined in the Credit Agreement), at the Default Rate per annum which shall be five (5%) percent above the applicable Interest Rate.

 Notwithstanding anything to the contrary contained herein, in no event shall the total of all charges payable under this Note and the Credit Agreement which are or could be held to be in the nature of interest, exceed the maximum rate permitted to be charged by applicable law. Should the Bank receive any payment which is or would be in excess of that permitted to be charged under any such applicable law, such payment shall have been, and shall be deemed to have been, made in error and shall automatically be applied to reduce the principal balance outstanding on this Note.

 This Note has been delivered by the Borrower to the Bank and shall be deemed to be a contract made under the laws of the State of New York and for all purposes shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of laws.

 The Borrower and the Guarantor expressly waive any presentment, demand, protest or notice in connection with this Note, now or hereafter, required by applicable law. No failure to exercise, and no delay in exercising any rights hereunder on the part of the Bank shall operate as a waiver of such rights.

1

The Borrower and the Guarantor hereby expressly and unconditionally waive, in connection with any suit, action or proceeding brought by the Bank on this Note, any and every right it may have to (i) injunctive relief, (ii) a trial by jury, (iii) interpose any counterclaim therein and (iv) have the same consolidated with any other or separate suit, action or proceeding. Nothing herein contained shall prevent or prohibit the Borrower from instituting or maintaining a separate action against the Bank with respect to any asserted claim.

This Note is secured by any and all of the Guaranty, Security and Collateral at any time granted to the Bank pursuant to Sections 3.9 and 3.10 of the Credit Agreement to secure any Indebtedness of the Borrower.

This Note is the Note referred to in, and is entitled to the benefits of, the Credit Agreement, dated the even date hereof (as may be further amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and between the Borrower and the Bank, to which reference is made hereinabove. In case an Event of Default shall occur and be continuing, the unpaid sum of the principal of this Note, together with all accrued but unpaid interest thereon shall be declared to be due and payable immediately in the manner and with the effect provided in the Credit Agreement.

The Borrower hereby agrees to pay and keep the Bank harmless from any liability for the expenses arising in connection with the enforcement by the Bank of any of its rights under this Note or the Credit Agreement.

(Corporate Seal)

Attest:

_____
SANDY LIANG, Secretary

BORROWER:

UNITED ALUMINUM DOOR INC.

By:  _____
      JEN-HAO MAO, Treasurer

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

On the 15th day of September, in the year 2000 before me, the undersigned, personally appeared JEN-HAO MAO, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

2

SCHEDULE  I

<u>SCHEDULE OF ADVANCES/PAYMENTS</u>

| <u>Date</u> | <u>Advances</u> | <u>Payment</u> | Unpaid<br>Principal<br><u>Balance</u> | Name of Person<br><u>Making Notation</u> |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |